Abdul G. BURIDI, Alexander Digenis, Shawn Glisson, Samer Hussein, Julio Melo, Rukhsana Rahman, Syed Raza[1] and Brian Thornton.[2] Appellants

v.

The LEASING GROUP POOL II, LLC; Citizens Union Bank of Shelbyville, Inc.; and Peoples Bank of Marion, Kentucky, Appellees

and

David Britt, Brian Paradowski, Keith B. Carter and John W. McConnell,[3] Appellants

v.

The Leasing Group Pool, II, LLC; Citizen's Union Bank of Shelbyville, Inc.; and Peoples Bank of Marion, Kentucky, Appellees

and

David Berry, Jefferey Campbell, Thomas Eckert, Eli R. Hallal, Eugene Giles, Amy Hallal Henderson, John E. Hate-

gan, Renato Larocca, Robert Karman, Charles Oates, Denis P. Raleigh, Lawrence R. Rouben, John D. Rumisek, Mio M. Stikovac, Anil K. Sharma, Leslie Strouse Mattingly and Christodulous Stavens,[4]Appellants

v.

The Leasing Group Pool II, LLC; Citizens Union Bank of Shelbyville, Inc.; and Peoples Bank of Marion, Kentucky, Appellees.

Nos. 2011–CA–001808–MR, 2011–CA–001858–MR, 2011–CA–001956–MR.[5]

Court of Appeals of Kentucky.

March 21, 2014.

Discretionary Review Dismissed by the Supreme Court Aug. 19, 2014.

---

1. This Appellant's name appears as "Syed Raza" in the body of the notice of appeal, but as "Syed T. Raza Kaqvi" in the style of the case and throughout the circuit court pleadings. We will refer to him as "Kaqvi."

2. By order entered June 5, 2012, this Court granted a motion to dismiss Alexander Digenis, Shawn Glisson, Julio Melo and Rukhsana Rahman as parties to Case No.2011–CA–001808–MR.

3. No original briefs were filed in Case No.2011–CA–001858–MR. However, by order entered April 4, 2012, this Court granted a motion that the Briefs for Appellants filed in Case Nos.2011–CA–1808–MR and 2011–CA–1956–MR be adopted in Case No.2011–CA–1858–MR. By order entered June 5, 2012, this Court granted a motion to dismiss John W. McConnell as a party to this appeal.

4. The Brief for Appellant filed in this appeal does not comply with Kentucky Rules of Civil Procedure (CR) 76.12. The format used for citations to the trial court record does not conform to CR 76.12(4)(c)(iv) in that we are

not referred "to the specific pages of the record." Furthermore, the arguments do not begin with a statement of preservation as required by CR 76.12(4)(c)(v). Finally, CR 76.12(4)(c)(vii) requires an appendix containing the opinions being appealed. The opinion and order awarding summary judgment is included in the appendix, but only the odd-numbered pages of the opinion and order denying the motions to alter, amend or vacate were included.

5. According to the Brief for Appellants, David Berry is deceased; Thomas Eckert and Renato LaRocca have resolved their disputes; and, since the filing of the appeal, Robert Karman and Denis P. Raleigh have filed for bankruptcy protection, staying any legal action against them pursuant to 11 U.S.C. § 362(1). *Parker v. Henry A. Petter Supply Co.*, 165 S.W.3d 474, 477 (Ky.App.2005) ("While the filing of a bankruptcy petition operates as a stay of claims against the bankrupt debtor, the courts retain jurisdiction.").

Trevor W. Wells, Lexington, KY, David S. Kaplan, Louisville, KY, for Appellants, Abdul G. Buridi, Alexander Digenis, Shawn Glisson, Samer Hussein, Julio Melo, Rukhsana Rahman, Syed Raza, And Brian Thornton.

6. On September 19, 2010, in the Southern District of Indiana, KMC filed a voluntary Chapter 11 bankruptcy petition that stayed any legal action against it. *In re Kentuckiana Medical Center, LLC,* Case Number 10–93039–BHL–11. During pendency of the complaint, KMC continued operating as a debtor in possession pursuant to 11 U.S.C. § 1108.

7. LGP is one of three Appellees, Citizens Union Bank of Shelbyville, Kentucky ("CUB")

No original brief filed, for Appellants, David Britt, Brian Paradowski, Keith B. Carter and John W. McConnell.

Michael W. McClain, Louisville, KY, for Appellants, David Berry, Jefferey Campbell, Eli R. Hallal, Eugene Giles, Amy Hallal Henderson, John E. Hategan, Charles Oates, Denis P. Raleigh, Lawrence R. Rouben, John D. Rumisek, Mio M. Stikovac, Anil K. Sharma, Leslie Strouse Mattingly and Christodulous Stavens.

John R. Tarter, Elizabeth B. Alphin, Louisville, KY, for Appellees.

Before COMBS, LAMBERT and NICKELL, Judges.

## OPINION

NICKELL, Judge:

Underlying these three related appeals are three commercial equipment and furniture leases Kentuckiana Medical Center, LLC ("KMC")[6] entered into with The Leasing Group Pool, II LLC ("LGP")[7] in June and September 2009, and on which KMC defaulted in 2010. The real focus of these appeals, however, is two personal guaranties executed by thirty doctors ("Appellants") to secure the leases. In the event KMC defaulted, the guaranties made each doctor jointly and severally liable for KMC's debt, up to $3,200,000.00.

Now that KMC has defaulted, the doctors admit signing the guaranties, but dis-

and Peoples Bank of Marion, Kentucky ("PBM") being the other two. CUB and PBM funded LGP's purchase of the equipment and furniture it ultimately leased to KMC. In return, LGP executed promissory notes and security agreements with both banks and assigned portions of KMC's commercial leases to them. Post-judgment invoices filed by Appellants show both banks demanded payment from KMC.

pute their enforceability under KRS[8] 371.065(1), claiming the guaranties do not "expressly refer" to the leases the Appellees say they guaranteed. The trial court found an internal reference in the guaranties made them statutorily sound and enforceable and awarded summary judgment to Appellees. On appeal, the doctors challenge the award of summary judgment, the amount awarded, and the denial of three motions to alter, amend or vacate the original opinion and order. The doctors generally denied the balance claimed of $2,890,405.84,[9] but offered no contradictory figure or proof while the summary judgment motion was pending. The trial court found attaching affidavits—drafted post-judgment—to a motion to alter, amend or vacate the order granting summary judgment was too little too late and denied the CR 59.05 motion.

In the context of whether the trial court properly granted Appellees summary judgment, we will address whether: the trial court awarded the correct amount of damages; the trial court abused its discretion in denying a motion to withdraw matters deemed admitted where Appellants did not timely respond to a request for admissions their attorney claimed was not received; and, the defenses of mistake and fraud were meritorious where some of the doctors claimed two of their own—not the Appellees or anyone acting on their behalf—misled them into signing the guaranties by assuring them they would be liable in an amount equal to their *pro rata* ownership of KMC rather than joint and several liability as plainly stated in the guaranties. Having reviewed the record, the briefs and the law, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

Despite a multitude of twists and turns, this is a deceptively simple case made complex by a missed deadline, multiple parties, and a significant amount of money being at stake. In our truncated, though still lengthy, recitation of facts we mention only those relevant to our holding. Due to limited discovery having occurred in this case, much of the history is culled from affidavits.

A plan was developed to launch KMC, a full-service, physician-owned hospital in Clarksville, Indiana, as a joint venture between Cardiovascular Hospitals of America, LLC ("CHA"), an entity based in Wichita, Kansas, and Kentuckiana Investors ("KI"), a consortium of local physicians who would practice at KMC. CHA was to be the majority shareholder—owning fifty-one percent of KMC—and KI was to be the minority shareholder—owning the remaining forty-nine percent. Dr. Christodulous Stavens, one of the Appellants, served as both the Chief Executive Officer ("CEO") of KMC and the initial manager of KI.

Doctors who purchased shares in KI were subject to KI's 2007 operating agreement in which they agreed:

to guaranty equipment loans or leases obtained by KMC, provided, however, the portion of such loans and/or leases guaranteed by such Member shall not exceed an amount equal to the amount of such loans (and/or leases) multiplied by a percentage equal to the number of Units owned by such Member as compared to the total number of Units owned by all Members, multiplied further by the percentage membership in-

---

8. Kentucky Revised Statutes.

9. We deem the award of an extra $00.04 to be a typographical error. The complaint de-

manded $2,890,405.80 and that is the total damages claimed by Appellees throughout the case.

terest then owned by the Company in KMC.

LGP, CUB and PBM were not parties to the KI operating agreement and there is no evidence they were aware of its terms.

With the foregoing backdrop in mind, we shift our focus to the three commercial leases and two personal guaranties at the heart of these three appeals. To outfit KMC with equipment, furniture and supplies, lease agreements with LGP were contemplated. To pave the way for the lease agreements, between May 26, 2009, and June 3, 2009, the thirty physicians signed two personal guaranties—a fact that is undisputed. In their entirety, the identical guaranties read:

UNCONDITIONAL GUARANTY
OF PAYMENT

**LESSEE:** *KENTUCKIANA MEDI-CAL CENTER, LLC*
**LESSOR:** *THE LEASING GROUP POOL II, LLC*
**LEASE NUMBERS:** *11681 and 11684*
[10]

To induce Lessor to enter into the foregoing Leases (with amendments), the undersigned unconditionally guarantee(s) to Lessor the prompt payment when due of all of Lessee's obligations to Lessor under the Leases (with amendments). **The Leases will be for medical equipment, furniture, and kitchen equipment installed and located at 4601 Medical Plaza Way, Clarksville, IN 47129.** Aggregate Lease payments for all leases with The Leasing Group Pool II, LLC will not exceed $3,200,000.00. **The undersigned agree(s) to pay all attorneys' fees and other expenses incurred by Lessor by reason of default by Lessee or the undersigned.** The undersigned waive(s) notice of acceptance hereof, and of all other notices or demands of any kind to which the undersigned may be entitled. The undersigned consent(s) to any extensions or modifications granted to Lessee and the release and/or compromise of any obligations hereunder. This is a continuing guaranty and shall not be discharged or affected by any cause or circumstance, including without limitation, death of the undersigned (or any of them if there is more than one), and shall be discharged only by the complete performance of all of Lessee's obligations under the Leases (with amendments). This Guaranty binds the heirs, administrators, representatives, successors and assigns of the undersigned and may be enforced by or for the benefit of any assignee or successor of Lessor. The undersigned consent(s) to the jurisdiction and venue provisions of the Leases stated above, as if references to "Lessee" were references to the undersigned. **If there is more than one undersigned, they shall be liable jointly and severally.** GUARANTOR UNDERSTANDS AND ACKNOWLEDGES THAT THIS GUARANTY IS A GUARANTY OF PAYMENT NOT COLLECTION AND THEREFORE LESSOR SHALL NOT BE REQUIRED TO PROCEED AGAINST LESSEE OR THE EQUIPMENT OR ENFORCE ANY OTHER REMEDY PROVIDED TO LESSOR UNDER THE LEASES PRIOR TO PROCEEDING AGAINST ANY OR ALL OF THE UNDERSIGNED GUARANTORS.

---

10. It is undisputed that lease numbers were handwritten on both guaranties on an unspecified date by an unnamed person *after* they were signed by all thirty doctors. The guaranties were identical, but for the handwritten lease numbers. The other guaranty bore Lease No. 11661.

(Emphasis added). While the physicians readily admitted signing the guaranties, they claimed they did so based on misleading assurances made to them by two of their own, Stavens and Dr. Eli R. Hallal,[11] promising that in the event of KMC's default, each KI shareholder's maximum liability would be his *pro rata* ownership of KMC—consistent with the KI operating agreement. Even though the wholly separate guaranties created joint and several obligations that contradicted the KI operating agreement, all thirty doctors signed both guaranties. Only one of the doctors, Dr. Alexander Digenis, claimed he questioned whether the guaranties created joint and several liability before signing. Depending upon which competing affidavit is believed, Digenis was either told it did or was not told it did not.

All parties agree the only direct contact between the individual doctors and LGP occurred when each doctor signed the two guaranties. Ben Shown, a LGP sales representative, stated in an affidavit that he personally witnessed all thirty doctors sign the single guaranty for Lease Nos. 11684 and 11681 and the separate guaranty for Lease No. 11661. All signatures were procured in May and June 2009, about two weeks before the two June leases were executed and about three months before the September lease was executed. Shown described the signing process as follows:

> [t]o the best of my recollection, none of the [physicians] who signed [the guaranty] asked me a question about its purpose or intent. However, one or more of the [physicians] may have asked whether [it] created joint and several liability. I explained that, as stated within [the guaranty], it did.

Shown also explained the staggered starting dates for the leases. Because all of the items being leased could not be delivered at one time, as an accommodation to KMC, two leases were executed in June and the third was delayed until September when the final items were delivered.

As mentioned previously, Digenis was the only doctor who claimed he asked about "joint and several liability" before signing the guaranties. He stated in his affidavit,

> [w]hen I signed the Guarantee Agreements, a representative purportedly of the Leasing Group as well as Paul Newsom, COO of KMC, were present in the room. Because my intention had been to assume only a pro rata share of KMC's liabilities based on my reduced ownership percentage of KI and I had just very recently embarked upon a course of action to give effect to that intention, I specifically asked whether the Guaranty Agreements were limited to pro rata liability and was not counseled otherwise.

There is no proof, or even an allegation, that any doctor—besides Stavens and/or Hallal—had direct contact with LGP, CUB or PBM (other than at the time of signing the guaranties); was asked to sign a document for the benefit of CUB or PBM relating to the guaranties; or was misled by Appellees or anyone acting on their behalf.

Stavens executed the three commercial lease agreements with LGP on KMC's behalf and admitted doing so in an affidavit dated December 8, 2010. According to the lease agreements, Lease Nos. 11661 and 11681 pertained to equipment received by KMC on June 23, 2009, and were signed that day; Lease No. 11684 pertained to

---

11. Hallal was a member of the Board of Managers of KMC and/or KMC Real Estate Inves-

tors, LLC, from whom the land on which KMC sits was leased.

equipment received by KMC on September 3, 2009, and was signed that day.

Things progressed smoothly until mid–2010, when KMC defaulted on all three leases. When their demands for payment were ignored, Appellees filed suit [12] in Jefferson Circuit Court on August 27, 2010, alleging breach of three commercial leases, two unconditional guaranties of payment, and one corporate guarantee of payment.[13] Appellees sought damages of $2,890,405.80 plus interest, attorney's fees and costs.

On September 21, 2010, Hon. Michael McClain filed a single answer [14] on behalf of all thirty doctors admitting execution of the guaranties but disputing: 1) their enforceability under KRS 371.065, and 2) the amount owed under the leases. Appellants stated in the answer, each guaranty "speaks for itself and [we] deny any characterization of that document that is inconsistent with its express terms." They also argued Appellees had failed to mitigate

damages and exhaust their rights as to any collateral.[15]

To move the case along, on September 24, 2010, Appellees mailed a discovery request, including a request for admissions and interrogatories,[16] to Ballinger McClain, PLLC, at the same address listed on the answer, asking Appellants to admit: 1) KMC entered into three commercial leases with LGP on which it defaulted; 2) Appellants executed two guaranties, personally committing themselves to pay KMC's debt to Appellees in the event of default; 3) the balance due on each of the delinquent lease accounts; and, 4) Appellees had demanded, but did not receive, payment of each balance. After responding to a discovery request from Appellants, and receiving no response to their own request for admissions, Appellees moved for summary judgment on November 8, 2010, attaching to the motion a duplicate copy of the original request for admissions; a supplemental affidavit from Appellees' counsel stating the request for

12. Suit was originally filed against KMC, CHA and thirty individually named doctors. Any action against KMC was stayed by the filing of the bankruptcy petition. On February 28, 2011, in the Southern District of Indiana, Dr. George L. Alcorn sought bankruptcy protection which stayed all legal action against him. *In re George L. Alcorn,* Case No. 11–90546–BHL–7A. The doctors moved the trial court to stay the proceedings against them in light of KMC having sought bankruptcy protection and because each of the doctors "works at and is a stakeholder in KMC, and each is intricately involved in KMC's efforts to reorganize." The trial court denied the requested stay on October 4, 2010, stating there is "[n]o provision for co-[defendant] stay."

13. The count pertaining to breach of corporate guaranty was unique to CHA. Because service was never perfected upon CHA, it did not participate in this litigation.

14. McClain practices with the law firm of Ballinger McClain, PLLC. On pleadings, including the answer filed on behalf of Appel-

lants, he lists the firm's address as "9720 Park Plaza Avenue, Suite 102, Louisville, KY 40241." Initially, McClain represented all thirty doctors. However, as conflicts of interest and divergent defenses were revealed, the doctors splintered into multiple groups and three separate law firms eventually represented their various interests.

15. During KMC's bankruptcy proceeding, the leased items remained at the hospital, but LGP retained ownership.

16. Pursuant to CR 5.06(1)(c), requests for admissions pursuant to CR 36 are not to be filed in the court record unless "the Court orders otherwise." No such order having been entered in this case, the request for admissions was not filed in the record leaving counsel's certificate of service as the only proof of mailing. According to the affidavit of the paralegal/administrative assistant who placed the request for admissions in the mail, it was not returned to Appellees by the United States Postal Service and there was no record in the firm's files showing such return.

admissions was served "via regular mail, on September 24, 2010," and no response had been received; a supporting memorandum of law; and the affidavit of Dennis Turner, LGP's treasurer and custodian of its business records.

Turner's affidavit, dated November 2, 2010, explained how the guaranties, leases, and associated promissory notes and security agreements came into being and specified $2,033,207.92 was due on Lease No. 11681; $579,676.62 was due on Lease No. 11684; and $277,521.30 was due on Lease No. 11661. Despite demand having been made for all three sums, Turner stated no payment had been received. The figures listed in Turner's affidavit mirrored proofs of claim [17] filed by Appellees in KMC's bankruptcy case.

In their summary judgment motion, Appellees argued Appellants' failure to respond to the request for admissions should result in these matters being deemed admitted and conclusively established under CR 36.02: 1) KMC entered into Lease No. 11661 with LGP on June 23, 2009, and subsequently defaulted leaving an unpaid balance of $277,521.30; 2) KMC entered into Lease No. 11681 with LGP on June 23, 2009, and subsequently defaulted leaving an unpaid balance of $2,033,207.92; 3) KMC entered into Lease No. 11684 with LGP on September 3, 2009, and subsequently defaulted leaving an unpaid balance of $579,676.62; and, 4) all thirty Appellants executed two personal guaranties making each liable for the full amount due and when payment was demanded, Appellants did not respond. Citing *Steelvest,*

*Inc. v. Scansteel Service Center, Inc.,* 807 S.W.2d 476, 482 (Ky.1991), Appellees posited they were entitled to summary judgment because any genuine issue of material fact should be deemed admitted and any defense or dispute was nullified.

Two days later, on November 10, 2010, McClain moved for an extension of time—until December 10, 2010—to respond to the summary judgment motion. Curiously, the extension motion made no mention of the original request for admissions mailed in September, nor the duplicate copy attached to the summary judgment motion served in November. When the extension motion was orally argued on November 15, 2010, Appellees did not object, and again there was silence from Appellants about the request for admissions. The trial court gave Appellants until December 10, 2010, to respond to the summary judgment motion.

The situation appears to have finally crystallized for McClain on December 10, 2010—a day marked by a flurry of filing activity by Appellants. A response was filed on behalf of twenty-seven of the thirty doctors opposing Appellees' motion for summary judgment coupled with a cross-motion for summary judgment in their own favor. The response argued Appellees should not be granted summary judgment because: 1) the guaranties, which were drafted by Appellees, were ambiguous—while stating the maximum aggregate liability was $3,200,000.00, the guaranties did not specify whether that figure included attorney's fees and costs [18] for which the doctors were also liable, and

---

17. Appellants submitted copies of the proofs of claim in this case as exhibits to their response opposing Appellees' motion for summary judgment.

18. In a footnote to the opinion awarding summary judgment, the trial court stated, "KRS § 371.065[2] permits attorney's fees, charges and collection costs to accrue beyond the maximum liability." We equate this statement of statutory language with a finding by the trial court that any amount of attorney's fees and costs that may be awarded in this case may exceed the maximum aggregate liability of $3,200,000.00 permitted under the guaranties.

there was no stated termination date—two requirements needed to satisfy KRS 371.065; 2) the leases did not exist when the guaranties were executed; 3) the lease numbers were handwritten on the guaranties *after* they had been signed, making it impossible for the doctors to know the true extent of the obligation they were accepting; 4) even if the guaranties were enforceable, the amounts claimed were unsubstantiated; and, 5) in light of the ongoing bankruptcy proceeding, any judgment for Appellees would be premature and could result in a double recovery.

The final argument in the response/cross-motion mentioned the request for admissions for the first time:

Counsel for [Appellants] has no record of having received [Appellees'] discovery requests until he realized they were attached to [Appellees'] motion for summary judgment. *See* Affidavit of Michael W. McClain, § 5. While the undersigned acknowledges the existence of [Appellees'] proof of service of the discovery requests, he represents to the Court that neither he nor his office received the requests until receipt of [Appellees'] motion for summary judgment. *Id.* Consequently, the undersigned respectfully requests the Court to grant relief from operation of Rule 36 which would deem unanswered requests as admitted and permit the [Appellants] to respond to the discovery requests in the event the [Appellants'] Motion and [Appellants'] Cross–Motions are denied.

McClain's affidavit, referenced above, stated in relevant part:

4. On or about November 15, 2010 Affiant appeared at motion hour to seek an extension of time through and including December 10, 2010 for the [Appellants]

to respond to [Appellees'] motion for summary judgment.

5. When Affiant reviewed [Appellees'] motion for summary judgment in preparing a response thereto, he noticed for the first time that [Appellees] alleged they had served discovery requests, including requests for admission, on the [Appellants] at Affiant's office.

6. Affiant reviewed the file and after a thorough search did not find the [Appellants'] discovery requests.

7. Affiant acknowledges the certificate of service appended to [Appellants'] discovery requests, and states that his office did not receive the requests, and had he received the requests, he would have reviewed them with [Appellants] and tendered a timely response. Affiant was actively involved in other aspects of the case when the discovery requests appear to have been served.

8. Affiant respectfully requests permission to tender late responses to the discovery requests and further requests that the admissions not be deemed admitted.

Also attached to the response/cross-motion was an affidavit from Stavens admitting KMC had entered into two leases with LGP on June 23, 2009, and a third lease on September 3, 2009, and he had signed all three leases as KMC's CEO. He also stated in late May and early June 2009, all thirty doctors "executed two separate, but identical documents entitled 'Unconditional Guaranty of Payment,' ... in favor of LGP."

Also filed December 10, 2010, was a motion to withdraw matters deemed admitted. The motion says McClain's affidavit is attached, but no affidavit was attached to the copy filed in the trial court record.[19] The motion was noticed to be

19. McClain's affidavit was, however, stapled

to the response to the summary judgment

heard on December 20, 2010, and included a request for permission to tender late responses to the discovery request.

When the withdrawal motion was finally heard on January 5, 2011, Appellees recounted the history of their request for admissions beginning with the mailing in September 2010, and ending with passage of several months without receipt of a response or a motion for an extension of time in which to respond. Appellees noted Turner's affidavit, which Appellants had not contested, "subsumed" all of the requested admissions, rendering moot the need for admissions. Appellees expressed a desire for Appellants to answer the interrogatories and requests for production it had served, but objected to the trial court allowing withdrawal of the matters deemed admitted and/or the filing of a late response to the request for admissions because Appellants had failed to respond and withdrawal would not serve the merits of the case as required by CR 36.02 since the matters deemed admitted would likely be stipulated at any hearing or trial. In response, McClain stated the request for admissions was not received until the summary judgment motion arrived in November with a copy attached, and further explained he had not tendered a late response because CR 36.02 requires leave of court to do so. As the eleven-minute hearing wore on, McClain requested the opportunity to respond to Appellees' discovery requests, but acknowledged uncertainty that a late response would change the posture of the case because,

> as a practical matter, what we are forced to admit, in all likelihood, is what is supported by [Turner's] affidavit. The only, I guess the only contention we could make is the calculation of what's due, but we don't have any contrary

motion filed the same day.

evidence, so I don't see how responding to the admissions will prejudice the [Appellants] in any way.

At the close of the hearing, the trial court allowed McClain to tender responses, but did *not* say the responses would be filed or considered.

While debate roiled over whether matters in the request for admissions should be deemed admitted or allowed to be withdrawn, the once-cohesive group of thirty doctors splintered into factions. On January 10, 2011, Hon. R. Kenyon Meyer and Hon. Caroline Lynch Pieroni entered an appearance on behalf of Drs. David Britt, Brian Paradowski, Keith B. Carter and McConnell. These four doctors were allowed to file a surreply [20] opposing the summary judgment motion. Filed on January 19, 2011, their surreply alleged: 1) Appellees drafted the guaranties so any flaws should be held against them; 2) no privity of contract existed between the doctors and CUB or PBM; 3) no termination date was stated in the guaranties; 4) the lease numbers did not appear on the guaranties when they were executed—the leases were not executed until weeks, or in one case months, after the guaranties were signed; 5) the doctors never became obligated to LGP under the leases because upon execution, LGP assigned the leases to the banks—making KMC solely liable to the banks on the leases; but, 6) the doctors were not liable to the banks either, since only the leases, not the guaranties, were assigned.

In the meantime, on January 12, 2011, McClain mailed a response to Appellees' first discovery request on behalf of all thirty Appellants. Regarding the request for admissions, Appellants responded: 1)

---

**20.** Ultimately, three separate surreplies were filed by various groups of doctors.

KMC entered into two leases with LGP on June 23, 2009, and a third lease on September 3, 2009; 2) KMC failed to make some payments required under the leases; 3) all three leases were defaulted, but the precise amounts due were denied and contrary sums were not provided; 4) Appellants executed two guaranties, but their delivery to LGP and their effect on the leases were denied; 5) LGP appears to have demanded payment from KMC on all three leases on August 5, 2010; 6) no demands were sent personally to any of the doctors; and, 7) believing Appellees were communicating with one or some of the doctors about the leases, Appellants denied the statement that no response had been made to the demands for payment.

On January 18, 2011, Hon. David Kaplan filed a notice of appearance on behalf of Drs. Abdul Buridi and Glisson and moved for leave to file a surreply to the summary judgment motion. Two days later, the trial court granted leave for Kaplan to file an amended answer on behalf of Buridi, Glisson and Dr. Hussein. The amended answer raised defenses of fraud and mistake for the first time—based on assurances made by Stavens and Hallal to the doctors that the extent of their financial liability would be limited to their *pro rata* ownership of KMC—and the allegation that LGP "knew or should have known that Hallal and Stavens had misrepresented to [Appellants] their maximum exposure on the Guaranty." The amended answer further alleged the guaranties did not form a contract due to inadequate consideration, no meeting of the minds, and Stavens and Hallal having exceeded their authority or agency by delivering the signed guaranties to Appellees "without notifying

[the doctors] as to the nature and extent of the obligations [the doctors] were being asked to guarantee personally."

On February 1, 2011, a surreply to the summary judgment motion was also filed on behalf of these three doctors, arguing discovery was incomplete, genuine issues of material fact were unresolved, and the proof of damages was insufficient because Turner's affidavit did not show how the amount claimed was calculated. This surreply also suggested Appellees should have reviewed the KI operating agreement to discover its inconsistent terms, and should have questioned the authority the doctors had given to Stavens and Hallal.

Also on February 1, 2011, McClain filed a surreply on behalf of twenty-one [21] doctors opposing Appellees' request for summary judgment and seeking summary judgment for themselves. This surreply adopted the two previously filed surreplies; reiterated alleged defects under KRS 371.065—no express reference to the instrument(s) being guaranteed, no termination date, and lack of contemporaneous execution of the guaranties and leases; alleged there was no valid contract due to a lack of a meeting of the minds; and claimed mistake because the doctors never agreed to accept joint and several liability.

On April 28, 2011, the trial court issued an opinion and order granting summary judgment to Appellees. The opinion summarized the handling of the request for admissions as:

[h]ere, there was an extensive delay in responding to the admissions. Not only was there no response to the original request, but also there was no response

**21.** When Appellees responded, they listed twenty-three doctors as having filed the surreply, whereas Appellants had identified only twenty-one. Karman may have been omitted due to his filing of a bankruptcy petition which would have stayed actions against him. We have no explanation for the omission of Dr. Charles Oates as an Appellant on whose behalf this surreply was filed.

to the second service by summary judgment motion. Further, [Appellants'] motion to allow a belated response was not expeditiously filed after [Appellees'] summary judgment motion was submitted. The failure to twice respond in a timely fashion, prolonging the discovery phase, is certainly prejudicial to [Appellants]. Significant time and effort has been expended on [Appellants'] summary judgment motion, predicated upon the admissions. To permit [Appellants] to amend the admissions at this late date would unduly prejudice [Appellees] in both time and resulting attorney's fees to rework their motion and briefs. Accordingly, [Appellants'] motion to withdraw their admissions will be denied. Consequently, the individual [Appellants] have admitted signing the guarantees, personally guaranteeing the debt and acknowledging the accuracy of the amount demanded. Finally, it must be noted that the presentation of the merits of the action will not be served by allowing [Appellants] to withdraw their admissions because the matters they have admitted have been contested neither by their Answers nor their Affidavits.

In denying Appellants' motion to withdraw the matters deemed admitted, the trial court held doing so would prejudice Appellees by causing them to rework their summary judgment motion and engage in discovery. The trial court further held,

> presentation of the merits of the action will not be served by allowing [Appellants] to withdraw their admissions because the matters they have admitted have been contested neither by their Answers nor their Affidavits.

This last passage appears to be an especially bitter point of contention for Appellants who maintain they consistently challenged the enforceability of the guaranties and the amount owed. Ultimately, the trial court concluded a general denial without supporting proof was insufficient to overcome the summary judgment motion.

Next, the trial court held the personal guaranties were enforceable under KRS 371.065 because they contained an internal reference specifying the nature and location of the property being leased. The trial court held inclusion of these terms adequately identified the debt the doctors were securing by executing the guaranties; eliminated the need for the guaranties to state the maximum aggregate liability and termination date; and, made post-execution addition of the lease numbers "irrelevant." The trial court repeated that any question about the amount owed had been deemed admitted.

Next, the trial court rejected Appellants' argument that even if the guaranties were statutorily sound, they were unenforceable by CUB and PBM because while the leases had been assigned to the banks, the guaranties had not. The trial court found a merger clause contained in paragraph 22 of each lease integrated the guaranties into the leases. The merger clause stated:

> (e) This instrument, the Schedules and any Annexes or supplements which refer to this Lease and say that they become a part of this Lease constitute the complete and exclusive statement of Lessor's and Lessee's agreement concerning the subject matter of this Lease.

Therefore, assigning the leases to CUB and PBM—which all parties agree occurred[22]—made the guaranties enforceable by all Appellees.

---

**22.** Turner's affidavit states "a portion of the lease payments" due under Lease Nos. 11681 and 11684 was assigned to CUB and "a portion of the lease payments" due under Lease No. 11661 was assigned to PBM.

Next, the trial court rejected the claim of fraud because there was no allegation LGP, CUB or PBM misrepresented anything. While there was a contention that Stavens and Hallal had misled the doctors with assurances their liability was only *pro rata* as stated in the KI operating agreement, there was not even a suggestion that any Appellee, or anyone acting on their behalf, said the personal guaranties created anything but joint and several liability—just as expressly stated in the guaranties. The trial court found Appellees had no duty to prevent the doctors from entering into agreements in 2009 that conflicted with the KI operating agreement the doctors had executed in 2007. The trial court further found the doctors had the opportunity to read the guaranties before signing them and to secure legal counsel if desired.

■ Next, the trial court rejected claims of mutual mistake and lack of a contract because the parties never reached a meeting of the minds. The trial court found a unilateral mistake by the doctors was not grounds to rescind or reform the guaranties. *Campbellsville Lumber Co. v. Winfrey,* 303 S.W.2d 284, 286 (Ky.1957). While a mutual mistake—one made by both parties—would have supported rescission, the necessary elements [23]—1) mutual mistake of a material fact 2) proven by clear and convincing evidence and, 3) written terms differing from the verbally agreed upon terms—were not established. *Abney v. Nationwide Mut. Ins. Co.,* 215 S.W.3d 699, 704 (Ky.2006) (citing *Campbellsville Lumber*). The guaranties plainly stated those signing "shall be jointly and severally liable" for KMC's entire debt in the event of default—that was LGP's understanding of the agreement, and there is no proof any Appellee, or anyone acting on their behalf, told any doctor anything to the contrary. In the trial court's view, any mistake was unilateral, made by the doctors alone, and insufficient to rescind the guaranties because "individual expectations are not a basis to circumvent their guarantee."

Finally, the trial court rejected the doctors' plea that the state court litigation be stayed because the bankruptcy court had recently ordered KMC to make adequate protection payments. The trial court concluded "a mere payment schedule will not absolve all liability" and Appellees will not be "unjustly enriched" by a double recovery because any amounts paid by KMC will be credited against the debt owed by Appellants and vice versa.

In the wake of the trial court awarding summary judgment to Appellees, three motions to alter, amend or vacate were filed. These motions argued: the bankruptcy court had entered summary judgment for KMC on May 6, 2011—after the trial court had awarded summary judgment to Appellees on April 28, 2011—finding the leases were "disguised security agreements"; [24] Appellees did not demon-

---

**23.** A mistake of law made by one party resulting from "fraud, undue influence or abuse of confidence" may justify rescission of an agreement. *Sadler v. Carpenter,* 251 S.W.2d 840, 842–43 (Ky.1952) (citing 17 C.J.S. *Contracts* § 145(b), p. 501). However, Appellants do not accuse Appellees of fraud; they accuse Stavens and Hallal of misleading them with false assurances about KI's operating agreement. While such assurances might form the basis for a claim against Stavens and Hallal,

they cannot be attributed to Appellees and, therefore, play no role in this case.

**24.** None of the doctors argued this ground to the trial court; while the doctors alleged the leases were security agreements in the bankruptcy court, the bankruptcy court discovered *sua sponte* that KMC could not satisfactorily perform the lease and return the property without incurring significant additional costs and, on that basis, awarded summary judgment to KMC. By attaching a copy of the

strate the type of prejudice justifying denial of the request to withdraw matters deemed admitted; the opinion misstated facts-mainly that Appellants had not challenged the admitted matters when they had consistently challenged the enforceability of the guaranties and the amount owed; denial of withdrawal of the matters deemed admitted unfairly prejudiced Appellants; and, it was erroneous to say Appellants had neglected to respond to the request for admissions when they did not receive the initial mailing and filed a response within days of the trial court granting leave for them to submit a late response.

The motions also argued: the judgment amount was wrong; the only proof of damages—Turner's affidavit—merely stated amounts due without supporting documentation and proof recently mustered by Appellants showed the proper amount should be only $2,310,191.75; questioned whether credit had been given for $30,000.00 in adequate protection payments made by KMC; the description and location of the leased property mentioned in the guaranties was too vague to qualify as an "express" reference to the three leases that were yet to be written; under KRS 371.065, guaranties may secure only *existing* instruments, and since the guaranties and leases were not executed contemporaneously, the guaranties were unenforceable. Finally, Appellants argued Appellees failed to mitigate damages; and, Appellants' failure to read the guaranties before signing should be excused due to fraud in the inducement.

McClain supported the CR 59.05 motion he filed with several items, including an affidavit from Timothy J. Donahue, KMC's Chief Restructuring Officer, dated May 9, 2011, saying the amount owed was $2,310,191.75—nearly $600,000.00 less than the amount awarded. Since summary judgment had been entered April 28, 2011, the trial court determined Appellants had offered this proof too late, but did modify the original opinion to retain control over the judgment amount to ensure any payments made by both KMC and the doctors were credited appropriately.

In reviewing Donahue's affidavit, we note it referenced two other items—an invoice from CUB dated May 3, 2011, and an invoice from PBM dated May 4, 2011—neither of which existed while the summary judgment motion was pending. However, Donahue's affidavit also referenced several other items that did exist but were not produced while the motion was pending, including: 1) a minute entry/order of the bankruptcy court dated February 17, 2011, requiring KMC to make $10.000.00 adequate protection payments [25] to Appellees; 2) a payment history showing KMC had paid $10,000.00 on March 7, 2011, March 24, 2011, and April 13, 2011; 3) an affidavit from an independent appraiser dated March 30, 2011, showing a "desktop" appraisal of machinery and equipment in KMC's possession on March 3, 2011, had an estimated fair market value of $1,561,200.00; and, 4) KMC's payment history to CUB and PBM for July 2009 through July 26, 2010. No explanation of these items not being placed in the trial court record when they could

---

bankruptcy court opinion to a CR 59.05 motion filed in the trial court, Appellants sought to argue the true nature of the leases created an even greater, unknown obligation for the doctors under the guaranties. Again, the trial court found the argument was not raised sea-

sonably—the argument had existed all along if only the doctors had looked for it and advanced it in a timely manner.

**25.** Appellees moved for such payments on or about January 25, 2011.

have influenced the outcome of the case was offered.

In a twenty-one page opinion and order entered on September 23, 2011, the trial court denied all three motions to alter, amend or vacate—with the exception of retaining jurisdiction to ensure payments were appropriately credited. The opinion reiterated that Appellants had not responded to the request for admissions when it was mailed in September 2010, nor had they reacted timely upon receiving a duplicate copy with the summary judgment motion in November 2010. The trial court stated "even absent the first failure, no excuse exists as to the second instance" and went on to say,

> [a]t the January hearing the Court permitted [Appellants] to place their tardy responses in the Court file. However, it did not state that it would consider the admissions and emphasized that by allowing the filing, the Court was not ruling that the filing was proper and acceptable. In the April 28, 2011, Opinion and Order, the Court detailed why the admissions were unacceptably late and therefore did not consider them.

As further explained in the opinion, the trial court found sufficient grounds to enforce the guaranties wholly apart from the admissions, and deemed the admissions important—if at all—on the limited issue of damages. The trial court found the guaranties were enforceable based solely on the internal reference to the furniture and equipment being leased and its location—a decision reached without reliance on the matters deemed admitted, or the late response to the admissions. The trial court specifically noted: KRS 371.065 does not require a guaranty to include a lease number to be enforceable; Appellants had

sufficient details to avoid insuring an unknown risk; and, the details provided were better than a lease number. On the claim that the guaranties and leases had to be executed contemporaneously, the trial court found KRS 371.065 does not require a lease to be in existence when a guaranty is executed and a court cannot add a requirement not included by the legislature. The trial court found Appellants' citation to the opinion of the bankruptcy court—which had not been rendered when the trial court awarded summary judgment to Appellees—was untimely and did not warrant relief. The trial court also concluded there was no evidence of mutual mistake and no apparent fraud or misrepresentation. The trial court found the doctors' failure to conduct due diligence before signing did not justify reforming the guaranties.

Finally, on the issue of damages, the trial court found the amount awarded was supported by Turner's affidavit, and the lease terms eliminated the requirement that Appellees mitigate damages.[26] Additionally, Appellants had offered no evidence of a different amount—other than a general denial—until *after* summary judgment had already been awarded. The trial court did grant a portion of the motion to alter, amend or vacate by modifying the original opinion to say,

> The Judgment rendered in the Court's April 28, 2011, Opinion and Order, will be reduced by any amounts paid to [Appellees] by [KMC], including the value of returned collateral. This Court will retain jurisdiction over the damages portion of this case as necessary to make the necessary adjustments in the award.

---

**26.** The opinion states Appellants did not assert failure to mitigate damages in the original answer. In reviewing the answer, we noticed lack of mitigation was the second defense raised.

Three separate notices of appeal were filed. These related, but unconsolidated, appeals [27] followed.

## ANALYSIS

### Enforcement of Guaranties

■ Ultimately, the central issues in this case are whether the guaranties were enforceable, the trial court properly granted summary judgment to Appellees without allowing more time for discovery, and the judgment amount was correct. To address the question of enforceability, we begin by reviewing KRS 371.065, a statute "unique to Kentucky." *Intercargo Ins. Co. v. B.W. Farrell, Inc.*, 89 S.W.3d 422, 426 (Ky.App.2002). Our review will be *de novo*—without deference to the trial court's interpretation. *Wheeler & Clevenger Oil Co., Inc. v. Washburn*, 127 S.W.3d 609, 612 (Ky.2004) (internal citations omitted).

Few cases interpret KRS 371.065, but those that do recognize its goal is to "reduce the risk" a consumer will agree to an unknown obligation—not to "eliminate" all unknown obligations. *Alliant Tax Credit Fund 31–A, Ltd. v. Nicholasville Community Housing, LLC*, 663 F.Supp.2d 575, 582 (E.D.Ky.2009) (citing *Wheeler*, 127 S.W.3d at 615 and collecting cases). Thus, our overall inquiry is whether the guaranties provided the doctors—sophisticated and learned individuals—sufficient detail to know the breadth of the obligation they were accepting before they signed. We believe they did.

KRS 371.065 directs:

(1) No guaranty of an indebtedness which either is not written on, or does not expressly refer to, the instrument or instruments being guaranteed shall be valid or enforceable unless it is in writing signed by the guarantor and contains provisions specifying the amount of the maximum aggregate liability of the guarantor thereunder, and the date on which the guaranty terminates.

. . . .

(2) Notwithstanding any other provision of this section, a guaranty may, in addition to the maximum aggregate liability of the guarantor specified therein, guarantee payment of interest accruing on the guaranteed indebtedness, and fees, charges and costs of collecting the guaranteed indebtedness, including reasonable attorneys' fees, without specifying the amount of the interest, fees, charges and costs.

The statute identifies three scenarios under which a guaranty may be valid or enforceable: (1) the guaranty may be written on the instrument being guaranteed; (2) the guaranty may "expressly refer to" the instrument(s) being guaranteed; or (3) the guaranty may specify the guarantor's maximum aggregate liability and the date the guaranty ends.[28] Only one of these separate and independent provisions must be satisfied. Thus, to be valid, a guaranty that expressly refers to the instrument being guaranteed need not be written on the same document, nor state the maximum aggregate liability and termination date. All parties agree neither the first nor third scenarios apply, leaving us to determine whether the two personal guaranties signed by all thirty doctors "expressly refer" to the three leases Appellees say they secured. We believe they did.

By reading the guaranties, we have gleaned the following details: the guaran-

---

**27.** A motion to consolidate the three appeals was denied by this Court on April 4, 2012.

**28.** The guaranties state a maximum aggregate liability of $3,200,000.00 but specify no termination date.

ties were associated with leases between KMC as lessee and LGP as lessor; the purpose of the guaranties was to "induce" LGP to enter into the leases with KMC; the signatories agreed to pay all of KMC's obligations to LGP under the leases when they became due; the "Leases will be for medical equipment, furniture, and kitchen equipment installed and located at 4601 Medical Plaza Way, Clarksville, IN 47129"; the aggregate lease payments for all of KMC's leases with LGP "will not exceed $3,200,000.00"; "any assignee or successor of" LGP may enforce the guaranty; if there is more than one signatory, "they shall be liable jointly and severally"; and, there were signature blocks for thirty doctors.

The signed guaranties provided to us also bear handwritten lease numbers, but we discount that fact because the leases were finalized after the guaranties were signed, making the lease numbers unknown to the doctors at the time of execution. Even so, because the doctors voluntarily signed the guaranties without benefit of having seen the actual leases, it is highly doubtful the mere lease numbers would have held much value for the doctors.

Based upon the eight pieces of valuable information recited above, we believe the doctors knew full well the obligation to which they bound themselves by signing the guaranties and had sufficient details upon which to calculate the risk being undertaken. After all, they were launching a hospital; they knew equipment, furniture and supplies would be needed to diagnose, treat and feed the patients; and there is no suggestion there was any confusion about the purpose or magnitude of the leases between KMC and LGP, nor that the guaranties pertained to an instrument or instruments other than the three leases discussed herein. Several doctors even stated in affidavits that the leases between KMC and LGP were contemplated when the guaranties were executed. For example, Digenis stated KMC and LGP:

were contemplating the execution of a Lease Agreement governing KMC's anticipated use of various hospital equipment and supplies, but at that time, no terms had been agreed upon and no Lease Agreement had been executed.

This same recollection was echoed in affidavits signed by Kaqvi and Sharma. Rahman referred to "the early stages of a proposed business transaction between KMC and [LGP]" in his affidavit. Thus, it would be disingenuous for the doctors to now claim they did not know the guaranties secured the leases being negotiated between, and subsequently executed by, KMC and LGP. Moreover, we note that KRS 371.065 neither expressly mandates only "existing" instruments may be guaranteed, nor that "future" instruments may not be guaranteed. We will not read words into a statute that are not there. *Bohannon v. City of Louisville*, 193 Ky. 276, 235 S.W. 750, 752 (1921).

We do not place much stock in Appellants' claim that the guaranties and leases had to be created contemporaneously or that the lease had to exist before the guaranties were signed. The guaranties clearly anticipated future action by twice using the word "will" as in, "[t]he Leases **will** be for medical equipment, furniture, and kitchen equipment ..." and "Aggregate Lease payments ... **will** not exceed $3,200,000.00." While details of the leases were still being hammered out, the doctors had adequate information on which to decide whether to sign and thereby bind themselves to the clear and unambiguous terms recited within the four corners of the guaranties. There is no proof any of the doctors requested more information,

balked at signing, or walked away without signing. Thus, there was no reason for anyone to think the terms were unacceptable to them. Consistent with *Wheeler* and *Alliant*, the terms in the guaranties gave the doctors sufficient information to allow them to calculate the risk they were assuming.

We find support for our view in *Smith v. Bethlehem Sand & Gravel Co., LLC*, 342 S.W.3d 288, 294 (Ky.App.2011), where a one-day delay between execution of a note and a guaranty was deemed "immaterial" because both were part of a single transaction. So it is with the peculiar facts of this case.

First, we are not troubled by the fact that the two guaranties are identical and do not distinguish between the two leases executed on June 23, 2009, and the single lease executed on September 3, 2009. Shown explained in his affidavit that the staggered starting dates were an accommodation to KMC—to prevent them from paying for items in June that would not be delivered until September. Because both guaranties were part of a single transaction, absence of a distinguishing factor is not fatal.

Second, while nearly three weeks passed between execution of the guaranties and two of the leases, and three months passed before execution of the third lease, the previously mentioned doctors' affidavits indicate negotiations were underway to finalize the leases when the guaranties were signed—said guaranties being the inducement for LGP to enter into the leases. It would be rare for a fully operational hospital to spring up overnight. It does not surprise us that there was a sequence of events leading to the launch of the hospital and that all of those of events were interrelated, but not contemporaneous. Based on the facts of this case, we believe the guaranties secured the leases and were enforceable. Therefore, we affirm the trial court on this issue.

### Unanswered Request for Admissions

 The next issue we address is the trial court's handling of Appellees' request for admissions. When Appellants failed to respond, several matters were automatically deemed admitted under CR 36.02.[29] Only if we determine the trial court abused its discretion in denying the motion to withdraw the matters deemed admitted—in other words, ruled in a way that was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles"—will we reverse. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999) (internal citation omitted).

*Harris v. Stewart*, 981 S.W.2d 122, 124 (Ky.App.1998), succinctly states the law regarding requests for admissions and the peril of not responding.

A proper request for admissions is often an effective tool in pretrial practice and procedure. Once a party has been served with a request for admissions, that request cannot simply be ignored with impunity. Pursuant to CR 36.01, the failure of a party to respond to such

---

**29.** "Any matter admitted under Rule 36 is conclusively established unless the court on motion permits withdrawal or amendment of the admission. Subject to the provisions of Rule 16 governing amendment of a pretrial order, the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits. An admission made by a party under Rule 36 is for the purpose of the pending action only and is not an admission by him for any other purpose nor may it be used against him in any other proceeding."

a request means that the party admits the truth of the allegations asserted. *See, Commonwealth of Ky. Dep't of Highways v. Compton*, Ky., 387 S.W.2d 314 (1964). Furthermore, any matter admitted under the rule is held to be *conclusively established* unless the trial court permits the withdrawal or amendment of the admissions. CR 36.02. Thus, an inattentive party served with a request for admissions may run the risk of having judgment entered against him based upon the failure to respond. *See, Lewis v. Kenady*, Ky., 894 S.W.2d 619 (1995). Pursuant to the rule, however, the trial court retains wide discretion to permit a party's response to a request for admissions to be filed outside the 30 or 45-day time limit delineated by the rule.

Here, a request for admissions was mailed to McClain on September 24, 2010. When no response was received, on November 8, 2010, Appellees moved for summary judgment and attached a copy of the request for admissions to the motion, asking that the matters included in the request be deemed admitted. McClain asked for more time to respond to the summary judgment motion and even orally argued for an extension of time—but never mentioned the request for admissions. It was not until about December 10, 2010, that McClain realized a request for admissions had been served in September, with a second copy provided in November, and the October deadline for responding had long expired. As a result, McClain prepared an affidavit stating he did not receive the request in September; did not promptly see the second copy in November; but in December, had moved the trial court to allow the matters deemed admitted to be withdrawn, and to grant leave of court for filing a late response.

At a hearing on January 5, 2011, counsel for Appellees' opposed withdrawal of the matters deemed admitted, noting all the matters covered in the request for admissions were "subsumed" within Turner's affidavit which Appellants had not contested—making the need for answers now moot. McClain also spoke of mootness, noting the doctors had no contrary proof to offer and the only matter they could possibly contest was the calculation of damages. Still, McClain asked for the opportunity to respond to the request for admissions. The trial court indicated it would allow the doctors to place a response in the court file, but did not say any such response would be filed in the record or considered. On January 12, 2011, McClain submitted a late response to the request for admissions which was placed in the court file.

Ultimately, however, the trial court did not consider the late response, and did not permit withdrawal of the matters deemed admitted. Appellants claim this was error because: Appellees did not prove they would be prejudiced by withdrawal; Appellants were unduly prejudiced; and even though the doctors had always admitted signing the guaranties, they had consistently disputed enforceability of the guaranties and the balance due under the leases.

The trial court found Appellees would be prejudiced if discovery were prolonged due to Appellants' untimely admissions, and if Appellees had to rewrite their summary judgment motion. The doctors argue that is not the type of prejudice envisioned by CR 36.02, and we agree. However, as we will discuss later, absence of prejudice is only one part of a two-part test. Under CR 36.02, withdrawal **may** be allowed when there is no showing of prejudice by the party that obtained the admission **and** "the presentation of the merits of the action will be subserved thereby[.]"

First, we must delve into what is meant by the term "prejudice" as used in CR 36.02. Finding no published Kentucky case examining the type of prejudice contemplated by the rule, we seek guidance from federal cases because Fed.R.Civ.P. 36(b)[30] is very similar. While not binding on our application of our state rule,[31] analysis of the similar federal rule often proves helpful.

In *F.D.I.C. v. Prusia*, 18 F.3d 637, 640 (C.A.8 1994),[32] the federal appellate court held the FDIC should have been allowed to amend its response to a request for admissions to correct the date on which it became a bank receiver where Prusia, a borrower who had defaulted on four promissory notes, was unable to show how he would be prejudiced by the amendment. In identifying the prejudice necessary to thwart withdrawal or amendment, the court wrote:

> [t]he prejudice contemplated by Rule 36(b) " 'relates to the difficulty a party may face in proving its case' because of the sudden need to obtain evidence required to prove the matter that had been admitted." *Gutting v. Falstaff Brewing Corp.*, 710 F.2d 1309, 1314 (8th Cir.1983) (quoting *Brook Village N. Assocs. v. General Elec. Co.*, 686 F.2d 66, 70 (1st Cir.1982)). The necessity of having to convince the trier of fact of the truth of a matter erroneously admitted

is not sufficient. *Davis [v. Noufal ]*, 142 F.R.D. [258,] 259 [ (D.D.C.1992) ]; *Ropfogel v. United States*, 138 F.R.D. 579, 583 (D.Kan.1991). Likewise, preparing a summary judgment motion in reliance upon an erroneous admission does not constitute prejudice. *Davis*, 142 F.R.D. at 259; *Rabil [v. Swafford ]*, 128 F.R.D. [1,] 3 [ (D.D.C.1989) ]. Prusia, as the party who obtained the mistaken admission, has the burden of proving that an amendment would prejudice him. *See* Fed.R.Civ.Pro. 36(b); *Ropfogel*, 138 F.R.D. at 582. After examining the record, we find that Prusia has made no showing that he would have been prejudiced by the admission.

Deeming the *Prusia* analysis to be logical and persuasive, we conclude that Appellees having to engage in discovery and rework a summary judgment motion so early in the litigation was not the type of prejudice envisioned by CR 36.02.

■ But prejudice is only one part of the equation. The trial court must also evaluate whether "the presentation of the merits of the action will be subserved" by withdrawal or amendment. It is with this part of the analysis that we have difficulty seeing how withdrawal of the matters deemed admitted would have done anything but delay the inevitable—a loss for Appellants.

---

**30.** Federal Rules of Civil Procedure 36(b) states in relevant part:

Effect of an Admission; Withdrawing or Amending It. A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended. Subject to Rule 16(e), the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits. An admission under this rule is not an admission for any other purpose and cannot be

used against the party in any other proceeding.

**31.** *Willis v. Willis*, 361 S.W.3d 341, 343 (Ky. App.2012).

**32.** Quoted in *Burns–Mahanes v. Loeb*, 2005 WL 2241043 (Ky.App.2005)(2004–CA–002195–MR) (rendered Sept. 16, 2005; unpublished). *Burns–Mahanes* is cited pursuant to CR 76.28(4)(c) allowing citation to an unpublished decision "if there is no published opinion that would adequately address the issue before the court."

We begin with the doctors' answer in which they acknowledged signing the guaranties, a point echoed in Stavens's affidavit. Stavens also acknowledged executing the three leases with LGP as KMC's CEO. The clear and unambiguous text of the guaranties makes the doctors "liable jointly and severally" for KMC's debts upon default.

▄▄▄ When contract terms are unambiguous, we look only to the four corners of the document—in this case, the guaranties—to determine the intent of the parties. *See 3D Enterprises Contracting Corp. v. Louisville and Jefferson County Metro. Sewer Dist.,* 174 S.W.3d 440, 448 (Ky.2005). "The fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous terms." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.,* 94 S.W.3d 381, 385 (Ky.App. 2002). In these guaranties, the phrase, "they shall be liable jointly and severally" is clear and unambiguous. Thus, we have no need to consider the 2007 KI operating agreement—especially since Appellees were not parties to it. Also in their answer, the doctors said each guaranty "speaks for itself and the Physician Defendants deny any characterization of that document that is inconsistent with its express terms." Thus, the doctors acknowledge agreeing to be bound "jointly and severally" for KMC's debts.

Turner's affidavit stated KMC had breached the leases and damages of $2,890,405.80 were due and owing. While the doctors attacked Turner's affidavit for not showing how the damages were calculated, they did not offer their own calculation prior to the entry of summary judgment. In fact, at a hearing on January 5, 2011, McClain stated the only item the doctors could contest was the amount owed; they would likely have to admit the

facts contained in Turner's affidavit; and, they had no contrary evidence to offer.

The foregoing review of the proof eliminates any material issue of genuine fact, thus, paving the way for the award of summary judgment to Appellees. We simply do not see how allowing withdrawal of the matters deemed admitted and permitting discovery would have changed the outcome of the issues between these particular parties.

Appellants further argue the guaranties were unenforceable due to noncompliance with KRS 371.065. As previously noted, however, the guaranties were statutorily sound because they expressly referred to the leases they guaranteed.

▄▄▄ The doctors generally denied the amount Appellees claimed was due, but offered no proof of a different amount until *after* summary judgment had already been awarded. A general denial was insufficient. "[A] party opposing a properly supported summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Steelvest,* 807 S.W.2d at 482. Appellants offered no such proof while the summary judgment motion was pending.

▄▄▄ As support for a CR 59.05 motion, McClain submitted a bankruptcy court opinion entered May 6, 2011; an affidavit showing the judgment amount should be reduced by nearly $600,000.00; and, other affidavits, payment histories, and invoices. However, a motion to alter, amend or vacate cannot be used "to introduce evidence that should have been presented during the proceedings before the entry of the judgment." *Gullion v. Gullion,* 163 S.W.3d 888, 893 (Ky.2005) (internal citations omitted). In that same vein, "[i]t is improper for a trial court to rely upon evidence of events that occurred subsequent to the trial in ruling on a CR 59.05

motion." *Id.*, at 894. In light of the foregoing, the trial court certainly did not snatch victory from Appellants by denying the motion to withdraw the matters deemed admitted or by granting summary judgment to Appellees.

While we agree there was an insufficient showing of prejudice, we do not believe the presentation of the merits would have been advanced by allowing withdrawal. Furthermore, we would not characterize the trial court's ruling as an abuse of discretion. CR 36.02 says "the court **may** permit withdrawal or amendment" when there is no showing of prejudice and the merits will be served by withdrawal or amendment. (Emphasis added). That means the ultimate decision rests in the trial court's sound discretion.

As the trial court stated, even if the lack of a response to the original mailing of the request for admissions in September was excusable due to nonreceipt, there was no excuse for counsel's failure to immediately seek permission to file a late response when the copy attached to the summary judgment motion was received in early November. Counsel admits receiving the second copy, but says he did not notice it until he began preparing his response to the summary judgment motion. It appears the second copy of the request sat in counsel's office, unbeknownst to him, for about one month—from November 8, 2010, or thereabouts, until about December 10, 2010.

*Harris* cautions about the risk of not timely responding to a request for admissions. We reiterate that warning here. In light of these facts, we cannot deem the trial court's decision to enforce the literal terms of CR 36.02 an abuse of discretion. *See Manus, Inc. v. Terry Maxedon Hauling, Inc.*, 191 S.W.3d 4, 8 (Ky.App.2006). To reverse the trial court would erode our rules of procedure. Seeing nothing "arbitrary, unreasonable, unfair, or unsupport-

ed by sound legal principles" in the trial court's decision, *English*, 993 S.W.2d at 945, we affirm.

## Summary Judgment

Finally, Appellants argue summary judgment was inappropriate because genuine issues of material fact existed and Appellants had no real opportunity to take discovery. We disagree. As previously noted, we discern no unresolved facts. Furthermore, Appellants had the opportunity to take discovery—but did nothing. Shown's deposition was scheduled at Appellants' request, but without explanation, Appellants cancelled it. Appellants have identified no discovery they wished to take but were prohibited from completing.

In reviewing the trial court's award of summary judgment, our task is to determine whether the trial court correctly found an absence of genuine issues of material fact and that Appellees were entitled to judgment as a matter of law. CR 56.03. On the basis of the record before us, we could reach no other conclusion. Appellants "could not prevail under any circumstances." *Steelvest*, 807 S.W.2d at 480 (citing *Paintsville Hospital Co. v. Rose*, 683 S.W.2d 255 (Ky.1985)).

## CONCLUSION

In reviewing these three appeals, the doctors' real objection appears to have nothing at all to do with LGP, CUB or PBM. Their objection is that they had agreed to *pro rata* liability under the 2007 KI operating agreement and assumed the guaranties they executed in 2009 were either consistent with or subservient to that operating agreement—an assumption that turned out to be legally unfounded and incorrect. Had the doctors read the guaranties and consulted with legal counsel to resolve any questions—both of which they had the opportunity to do but did not—it is unlikely they would be in their current predicament. Because the doctors failed

to take these reasonable and necessary precautions, we have no basis upon which to grant them relief from the guaranties they admit signing. "Under Kentucky law, 'a party who can read and has an opportunity to read the contract which he signs must stand by the words of his contract ... [.]'" *Smith*, 342 S.W.3d at 295 (internal citations omitted).

Therefore, we affirm the trial court's award of summary judgment to Appellees, and its order that Appellants, jointly and severally, pay Appellees the amount of $2,890,405.80. We also recognize the trial court's retention of continuing jurisdiction over the damages award to ensure all payments made by KMC and the doctors are properly credited.

ALL CONCUR.