RENDERED: JANUARY 15, 2021; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2017-CA-0615-MR

LAUREN SAVAGE, INDIVIDUALLY
AND AS ADMINISTRATRIX OF THE
ESTATE OF JAMES SAVAGE                                    APPELLANTS


APPEAL FROM JEFFERSON CIRCUIT COURT
v.        HONORABLE FREDERIC J. COWAN, SPECIAL JUDGE
ACTION NO. 12-CI-006824


ALLSTATE INSURANCE COMPANY;
PROPERTY & CASUALTY INSURANCE
COMPANY OF HARTFORD;
CO-PART OF CONNECTICUT, INC.;
D/B/A CO-PART AUTO AUCTIONS;
WILLIS JOHNSON; PAUL STYER;
WILLIAM FRANKLIN; TOM TAYLOR;
DANIEL BOND; CHAPA, INC. D/B/A
CHAPA AUTO SALES; MARGARITA CHAPA;
OSCAR RAMOS; LIBERTY MUTUAL FIRE
INSURANCE COMPANY;
VENTURA FELIX BARRAZA; AND
AUTOS USADOS FELIX                                          APPELLEES

<u>OPINION</u>
<u>AFFIRMING IN PART,</u>
<u>REVERSING IN PART,</u>
<u>AND REMANDING</u>

** ** ** ** **

BEFORE: COMBS, DIXON, AND MAZE, JUDGES.

MAZE, JUDGE: Lauren Savage, individually and as Administratrix of the Estate of James Savage (collectively, "the Estate") appeals from a judgment of the Jefferson Circuit Court confirming a jury verdict. The Estate raises multiple issues involving quashing of service on a defendant who is a foreign national; dismissal of its claims against the insurance companies; dismissal of several statutory claims against Co-part of Connecticut, Inc., d/b/a Co-part Auto Auctions (Co-part); denials of motions to file amended complaints; various evidentiary rulings; the denial of its motion for a directed verdict against Co-part; and the granting of a directed verdict on its claim for punitive damages. For the reasons that follow, we affirm the orders and judgment on all matters except as to the claims against Co-part. We conclude that the trial court erred by dismissing several statutory claims and abused its discretion in several evidentiary rulings. Hence, we reverse the judgment in favor of Co-part with respect to those matters, and we remand for a new trial against Co-part.

## I.    FACTUAL HISTORY

This is a multi-party action relating to an automobile accident that occurred on March 6, 2012.  The underlying facts and relationships among the parties are unique and defy simple explanation.  Likewise, the procedural history and complex issues presented would be difficult to imagine if presented as a fact-pattern for an essay question on the bar examination. Therefore, we shall first set out the parties and the factual history of this matter, followed by the procedural history of this action.

Co-part provides online motor vehicle auction services.  It maintains facilities throughout the country, and most relevant to this case, has locations in Finksburg, Maryland and Louisville, Kentucky.  Co-part is a licensed motor vehicle dealer and auction dealer in both Maryland and Kentucky.  Among other things, Co-part contracts to store and sell salvage vehicles on behalf of insurance companies who have acquired them after declaring them a total loss.

Prior to the accident, Allstate Insurance Company (Allstate) acquired title to a totaled 2003 Toyota Tacoma from an insured.  Thereafter, Allstate obtained a Maryland salvage title and delivered the vehicle to Co-part's Maryland location.  Similarly, Property and Casualty Insurance Company of Hartford (Hartford) acquired title to a totaled 2004 Jeep Wrangler from an insured.  Hartford

delivered the Jeep and the Kentucky salvage title documents to the Co-part location in Louisville.

Under its service agreements with insurance companies, Co-part is required to do a "run and drive" verification and to state in its auction description whether the vehicles are drivable or towable. The service agreements also required Co-part to maintain tires on all vehicles where practicable. The agreements permitted Co-part to refuse to release any vehicle for any reason. Co-part advertised the Toyota as drivable but determined that the Jeep was in a non-run and non-towable condition. Co-part included these descriptions in its online advertising of the vehicles.

Sales and delivery of vehicles are limited only to paid Co-part "members." Members receive a number, which is used to access Co-part auctions. Members also use the number to fund a credit balance for payment of online auction purchases. Co-part facilitates the transfer of title from the insurer to the buyer. Co-part either offers to deliver a purchased vehicle to the buyer for a fee or releases the vehicle to an authorized representative of the buyer. In the case of the latter, the representative must present the buyer identification number and the lot number of the specific vehicle. Upon receipt of this information, Co-part would deliver the vehicle to the buyer at a "bullpen" within Co-part's compound. In the

case of a salvage or non-drivable vehicle, Co-part would deliver the vehicle to the bullpen using a forklift.

In February, the vehicles were sold to Ventura Felix Barraza d/b/a Autos Usados Felix (AUF), a used auto and parts dealer located in Los Mochis, Sinaloa, Mexico.[1] AUF sent Oscar Ayon Ramos (Ramos) to pick up the vehicles. On his way to pick up the vehicles, Ramos obtained two Arizona Restricted Use Three-Day Permits[2] through Chapa Auto Sales (Chapa), a used car-dealer located in El Paso, Texas. Ramos then proceeded to Maryland to pick up the Toyota.

---

[1] The record indicates that Barraza is an individual who operates AUF as a sole proprietorship. Unless the context requires otherwise, we will refer to both as "AUF."

[2] The website of the Arizona Department of Transportation, Motor Vehicle Department, describes the Permit as follows:

> A Restricted Use 3-Day Permit allows a person to operate an unregistered vehicle or a vehicle with a suspended registration from the present location of the vehicle to a specified destination. The Restricted Use 3-Day Permit is valid only for the following purposes only:
>
> • Emissions Testing
> • Vehicle Inspection
> • Application for Title and/or Registration
> • Vehicle repair to comply with Emissions or Inspection
>
> The Restricted Use 3-Day Permit is valid only for these stated purposes. Travel for any other purpose, including commercial interstate movement, is strictly prohibited.
> Customer Advisory: misuse of this permit is a violation of Arizona Revised Statutes, Title 28, Chapter 7, Article 16, subjecting the violator to civil and/or criminal penalties.

https://servicearizona.com/applicationFAQ/3day (last accessed October 16, 2020).

Following the online sales, Co-part, on Allstate's behalf, executed an assignment and warranty of title on the Toyota's Certificate of Salvage in favor of AUF. Similarly, Co-part, on Hartford's behalf, executed a transfer of the Jeep's Kentucky Salvage title to AUF. AUF directed Co-part to deliver the title document to the Jeep to "Ramon Martar Bubio," and Co-part's records indicate that it did so on March 2, 2012.

On March 5, 2012, Ramos appeared at Co-part's Maryland facility. He provided the AUF member number and lot number of the Toyota. Co-part then delivered the Toyota to Ramos. Co-part also gave Ramos the Toyota's Certificate of Salvage, which it had executed on behalf of Allstate.

Ramos then affixed the Arizona Permit to the Toyota and drove the vehicle to Co-part's Louisville facility. On March 6, he arrived at the Louisville facility, where he presented the AUF member number and lot number of the Jeep. As with the Toyota, Co-part executed the dealer assignment portion of the Jeep's title on Hartford's behalf. At the direction of AUF, the title was delivered to Bubio on March 2.

Upon receipt of the documentation, Co-part delivered the Jeep to Ramos. Ramos then affixed the Arizona Permit to the Jeep and attached a tow bar between the Toyota and the Jeep. Ramos then left the Co-part facility with the Jeep being towed by the Toyota.

Several hours later,[3] while driving on I-65 in Louisville, Ramos lost control of the vehicles while changing lanes. James Savage was riding a motorcycle in the same vicinity. There was testimony that another vehicle had lost a load of wooden pallets, requiring other drivers to swerve to avoid them. There was also testimony that Savage struck one of the pallets and was thrown from his motorcycle. Ramos' vehicles side-swiped a tractor-trailer truck, and then ran over Savage, who was lying in the roadway. Savage was killed at the scene. Additional facts will be set forth below as necessary.

## II. PROCEDURAL HISTORY

Subsequently, Lauren Savage qualified as Administratrix of the Estate of James Savage. On December 27, 2012, the Estate and Lauren Savage individually filed a complaint asserting claims arising from the accident. The complaint named: (1) Allstate, as owner of the Toyota; (2) Hartford, as owner of the Jeep; (3) Ramos; (4) Co-part; (5) Co-part founder and Chief Executive Officer Willis Johnson; (6) Co-part general counsel and Executive Vice-President Paul Styer; (7) Co-part Chief Financial Officer and Executive Vice-President William Franklin; (8) Tom Taylor, manager of Co-part's Louisville facility; (9) Daniel

---

[3] Approximately five and a half hours lapsed between Co-part's release of the Jeep at the Louisville facility and the accident. Furthermore, the accident occurred only a few miles away from Co-part's facility. There was no evidence concerning the location of Ramos or the vehicles during this period.

Bond, employee of Co-part's Louisville facility; and (10) Chapa, Inc. d/b/a Chapa Auto Sales, the El Paso dealership which obtained the Restricted Use Permits for Ramos, and Margarita Chapa, owner of Chapa Auto Sales (collectively, "Chapa").

The Estate attempted to serve Ramos through the Kentucky Secretary of State's office, using the address listed on Ramos' Mexican driver's license. Ramos appeared specially to contest the sufficiency of service on him, arguing that he was not properly served as a foreign national. The trial court agreed and entered an order on September 24, 2013, quashing service on Ramos. As discussed below, the Estate attempted a second service on Ramos through Chapa after the trial in this matter.

Subsequently, Co-part filed a third-party complaint naming AUF and Ramos. Service of that complaint was never effected on Ramos. Barraza, on behalf of AUF, filed a *pro se* response using an address in Mooresville, Indiana. However, all subsequent attempts at service using that address were returned as undeliverable.

Margarita Chapa filed an answer to the complaint but did not otherwise participate in the proceedings. Since Chapa did not respond to any of

the requests for admission, they were deemed admitted. Among these included an admission that Ramos was acting as an employee or agent of Chapa. [4]

The Estate asserted that Allstate remained the owner of the Toyota and Hartford remained the owner of the Jeep for insurance purposes. The Estate also asserted that Co-part should be considered an owner of both the Toyota and the Jeep for insurance purposes because it failed to obtain proof of insurance prior to releasing the vehicles to Ramos.

Separately, the Estate asserted claims against Co-part for negligence, negligent entrustment, and violations of its statutory duties as an auto dealer. The Estate also asserted claims against Co-part executives Johnson, Styer, and Franklin for negligent hiring, supervision, and training of Co-part employees. And the Estate asserted claims against Louisville Co-part employees Taylor and Bond for their actions in releasing the Jeep to Ramos. Liberty Mutual, the insurance carrier for Co-part, provided a defense for Co-part, its officers and employees. However, Liberty Mutual did not provide a defense for Chapa or the absent defendants AUF and Ramos.

---

[4] In the *pro se* pleading, Margarita Chapa asserted that Ramos was never an employee of Chapa. This assertion was properly disregarded for several reasons. First, Margarita Chapa had no authority to file pleadings on behalf of the purported corporate entity, Chapa, Inc. Second and more importantly, Margarita Chapa and Chapa Auto Sales failed to respond to any additional pleadings and did not further participate in the action. Thus, the Estate's claim that Ramos was acting as an employee or agent of Chapa was deemed admitted.

In 2014, the Estate filed a motion for leave to file an amended complaint asserting that Allstate, Hartford, and Co-part were engaged in a joint venture, joint enterprise, or partnership. The trial court denied the Estate's motion to file the amended complaint.

Later in 2014, Allstate, Hartford, and Co-part each filed motions for summary judgment. Allstate and Hartford each argued that any ownership interest in the vehicles passed to AUF upon transfer and delivery of the titles. The insurance companies separately moved for a judgment finding that they had no obligation to insure either the Toyota or the Jeep.

Similarly, Co-part moved for summary judgment on the Estate's claim that it had an ownership interest which obligated it to insure the vehicles. Co-part and Hartford each moved for a judgment finding that the Jeep was not being operated so as to require insurance coverage. Co-part also moved for summary judgment on the negligent entrustment claims and to dismiss the claims against its executives. And the Estate also filed a motion for partial summary judgment regarding insurance coverage on the vehicles.

Thereafter, the trial court issued a series of orders addressing the motions. On October 29, 2014, the trial court granted Allstate's motion for summary judgment. The court found that Allstate had properly transferred the Certificate of Salvage to AUF under Maryland law prior to the transfer of

possession of the Toyota vehicle. Consequently, the court concluded that Allstate had no duty to maintain or insure the vehicle after the sale. Accordingly, the trial court dismissed the claims against Allstate.

On the other hand, the trial court denied Hartford's motion for summary judgment. While the court concluded that Hartford had properly transferred title to the Jeep under Kentucky law, the court also found that there were issues of fact concerning the extent of the agency relationship between Hartford and Co-part. Because these issues implicated Hartford's liability for Co-part's alleged negligence, the court concluded that Hartford was not entitled to be dismissed at that point in the proceedings.

The trial court next denied the Estate's motions for partial summary judgment on the issues of insurance coverage of both vehicles and "operation" of the Jeep. Because both vehicles had salvage titles, neither vehicle could be lawfully operated on Kentucky highways. Even though the Toyota was being unlawfully operated, the court determined that it was not subject to the mandatory insurance requirement at the time of transfer. The court also held that the Jeep was not being "operated" within the meaning of KRS[5] 186A.520(6) because it was

---

[5] Kentucky Revised Statutes.

being towed by the Toyota. Therefore, the court determined that the Jeep was not subject to the mandatory insurance requirement at the time of transfer.

On January 6, 2015, the trial court granted Co-part's motion for summary judgment on the Estate's claims for violations of KRS 186A.065, 186A.100, 186A.520, 186A.540, 189.020, 189.100 and 189.290. The court determined that these sections were not applicable because the titles to the vehicles had been transferred before delivery to Ramos, the transfer of the Toyota was not subject to Kentucky law, and neither vehicle was subject to the mandatory insurance and verification requirements. However, the court denied the motion for summary judgment with respect to the Estate's claims against Co-part for negligence, negligent entrustment and violations of KRS 189.224 and 189.226.

Following entry of these orders, Hartford filed a motion to reconsider the denial of its motion for summary judgment. On June 11, 2015, the trial court granted Hartford's motion, finding that "a closer review of the agreement between Co-part and Hartford limits the agency relationship between them such that Hartford would not have control over Co-part's agreements with its buyers." In the absence of any evidence that Hartford exercised control over Co-part's sale and delivery of the Jeep, the court determined that it could not be liable for any negligence by Co-part. In the same order, the court denied the motion to

reconsider its denial of summary judgment on the Estate's remaining claims against Co-part and its employees, Taylor and Bond.

Co-part then filed motions for summary judgment on the Estate's claims for punitive damages and pain and suffering. Co-part also moved to limit the Estate's evidence of Savage's loss of power to earn money. And Co-part filed a motion to reconsider the partial denial of its motion for summary judgment on the Estate's claims against it and its executives Johnson, Styer, and Franklin.

On November 10, 2015, the trial court entered orders on the motions. The court denied Co-part's motion for summary judgment on punitive damages but granted it on the Estate's claims for Savage's pain and suffering. On the latter issue, the court found no evidence to dispute the allegation that Savage was unconscious from the point of impact until his death.

Separately, the court granted Co-part's motion to exclude evidence of Savage's receipt of Social Security Disability (SSD) benefits and his loss of earning capacity. The court found that Savage's permanent disability at the time of death left him without the power to labor and that disability benefits do not constitute the power to earn. However, the court found that evidence of Savage's potential pension benefits was admissible.

Finally, the trial court granted Co-part's motion to reconsider its denial of summary judgment on the claims against Johnson, Styer, and Franklin.

The court determined that that the executives could not be individually liable for negligence of the corporation or its agents. Therefore, the court dismissed these claims.

During the lead-up to trial, the parties filed several motions on evidentiary and procedural issues. Co-part filed motions to exclude or limit the testimony of the Estate's experts. Co-part also moved to exclude testimony or evidence concerning its duties as a used car dealer. In addition, Co-part sought to withdraw or amend its prior admission that Ramos "drove out" the Toyota from the Maryland facility. Co-part also filed objections to the testimony of the Estate's experts and moved to exclude any reference to Allstate, Hartford, or Liberty Mutual.

For its part, the Estate also filed objections to the testimony of Co-part's experts. Similarly, the Estate moved to exclude evidence that Savage was not wearing a helmet, as well as any evidence of his prior medical history and use of pain medication.

In orders entered on December 1, 2015, the trial court ruled on the objections to the deposition testimony and Co-part's motion to withdraw its admission. In pertinent part, the trial court granted Co-part's motions to exclude testimony concerning the insurance carriers and to limit testimony offered by the Estate's experts. Separately, the court denied the Estate's motion to limit

introduction of bulk medical records. The court also denied the Estate's motions to exclude testimony offered by Co-part's accident-reconstruction experts. And the court denied the Estate's motion to exclude testimony that Savage was not wearing a helmet and his prior use of pain medication. However, the court granted the Estate's motion to exclude any reference to Savage's prior criminal history.

On December 8, 2015, the trial court entered an order granting Co-part's motion to exclude the testimony of the Estate's expert, Larry Craig. The court also granted Co-part's motion to limit the testimony of Officer Samuel Cromity as only a fact witness and not an expert. Finally, the court granted Co-part's motion to exclude any evidence concerning Co-part's transfer of the Toyota but held that the Estate could present circumstantial evidence that Ramos drove the Toyota from Maryland to Kentucky.[6]

The Estate then moved to file an amended complaint against Liberty Mutual to extend coverage under Co-part's policy to Chapa, Ramos, and AUF. The amended complaint also sought to add AUF and Barraza as defendants. The trial court denied the motion to file an amended complaint as untimely.

---

[6] Following entry of these orders, the trial judge recused herself after learning of a previously-undisclosed relation to the Estate's administrator. The case was reassigned to a different division of the Jefferson Circuit Court. However, the judge of that division was unable to hear the case, leading to the assignment of a special judge, who handled the pre-trial motions, jury trial, and post-trial motions.

Heading into 2016, the parties continued to file motions on evidentiary issues. The court addressed these motions in an order entered on May 20, 2016. In relevant part, the court denied the Estate's motion to introduce evidence of payments by Liberty Mutual to Co-part's experts. Similarly, the court declined to revisit its prior rulings concerning the admissibility of the testimony of the Estate's experts, Samuel Cromity, Scott Borrows, Sonny Cease, and Larry Craig.

The court also denied the Estate's motion to refer to Co-part as a used car dealer in Kentucky Motor Vehicle Commission (MVC) documents and to introduce regulations and documents from the MVC outlining Co-part's duties as a used car dealer. Finally, the trial court denied the Estate's motion to reconsider its prior order granting Co-part's motion to withdraw its admission. The court found that the Estate was not unfairly prejudiced by the withdrawal. The court noted that the Estate was aware of factual issues regarding whether Ramos drove the Toyota out of the Maryland facility since at least April 2014, but the Estate chose not to pursue any discovery on the issue.

The case then proceeded to a jury trial in late May and early June of 2016. At the close of proof, the Estate moved for a directed verdict on liability against Co-part, Taylor and Bond on the claims for negligent entrustment, training, and supervision. The trial court denied the motion. Co-part, Taylor, and Bond

also moved for a directed verdict on punitive damages, which the trial court granted.

The trial court then instructed the jury on the remaining claims against Co-part, Taylor, Bond and the defaulting Chapa. The jury found no negligence on the part of Co-part, Taylor or Bond. Rather, the jury determined that Chapa, through its agent Ramos, was solely at fault for the damages. The jury awarded the Estate a total of $75,164.00 in compensatory damages and $5,000,000.00 in punitive damages. The jury also awarded Lauren Savage $500,000.00 for her loss-of-consortium claims.

Following the trial, the Estate filed an amended complaint against Liberty Mutual, asserting claims for the liability of Chapa and Ramos under Co-part's policy. The Estate also issued an alias summons to Ramos at Chapa's Texas address. The Estate asserted that service at that address was proper because Chapa had admitted that Ramos was acting as its agent or employee. Based upon this service, the Estate also sought a default judgment against Ramos.

Liberty Mutual objected to the filing of the amended complaint, stating that it did not have notice of any claims against Chapa and Ramos under Co-part's policy. Thus, Liberty Mutual argued that it was unfairly prejudiced by the amended complaint because it never undertook to provide a defense to those parties. Separately, the Estate filed motions to reconsider the court's prior rulings

regarding Allstate's ownership of the Toyota and Hartford's ownership of the Jeep. In an order entered on October 18, 2016, the trial court denied the motions to reconsider.

Following briefing and oral arguments on the remaining issues, the trial court entered its trial verdict and judgment on January 9, 2017. The trial court confirmed the jury verdict against Chapa alone. In a separate order entered on January 19, 2017, the trial court: (1) quashed the service of the amended complaint against Ramos; (2) denied the motion for a directed verdict against Ramos; and (3) dismissed the amended complaint against Liberty Mutual.

Shortly after entry of this order, the Estate filed motions to alter, amend or vacate, for a judgment notwithstanding the verdict,[7] or for a new trial.[8] The trial court denied these motions on March 9, 2017. This appeal followed. Additional procedural history will be set forth below as necessary.

## III. ISSUES

The Estate's brief identifies twenty-four separate issues on appeal. These issues may be grouped as follows: (1) sufficiency of service on Ramos; (2) Allstate's ownership of the Toyota; (3) Hartford's ownership of the Jeep; (4) the insurers' liability for negligence, negligent entrustment, and statutory violations;

---

[7] Kentucky Rules of Civil Procedure (CR) 59.05.

[8] CR 59.01.

(5) Co-part's obligation to provide insurance coverage on the vehicles; (6) the denial of the Estate's motions to file an amended complaints; (7) scope of Co-part's liability for statutory violations; (8) dismissal of the Estate's claims against Johnson, Styer, and Franklin; (9) evidentiary and trial issues; (10) directed verdict issues; and (11) modification of the judgment against Chapa. We will address these issues in order.

## IV. SUFFICIENCY OF SERVICE ON RAMOS

The Estate first challenges the trial court's decisions to quash the service of process on Ramos twice. Because the accident occurred in Kentucky, Ramos was subject to personal jurisdiction for "[c]ausing tortious injury by an act or omission in this Commonwealth . . . ." KRS 454.210(2)(a)3. The Estate further relies on KRS 188.020, which provides that:

> Any nonresident operator or owner of any motor vehicle who accepts the privilege extended by the laws of this state to nonresidents to operate motor vehicles or have them operated within state shall, by such acceptance and by the operation of such motor vehicle within this state, make the Secretary of State the agent of himself or his personal representative for the service of process in any civil action instituted in the courts of this state against the operator or owner, or the personal representative of the operator or owner, arising out of or by reason of any accident or collision or damage occurring within this state in which the motor vehicle is involved.

Pursuant to this section, the Estate served its initial complaint on the Kentucky Secretary of State's office. That office then forwarded it to the address listed on

Ramos' Mexican driver's license, which he provided to the police at the scene of the accident.

Appearing specially, Ramos argued that service of process on a foreign national is subject to the requirements of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the Hague Convention). The trial court agreed and quashed the service, concluding that the Estate failed to comply with the requirements of the Hague Convention. The Estate argues that the Hague Convention is not applicable because service on the statutorily-designated agent was sufficient to bring Ramos before the court.

The application of the Hague Convention is an issue of law, which we review *de novo*. *Cinelli v. Ward*, 997 S.W.2d 474, 476 (Ky. App. 1998). The Hague Convention is a multilateral treaty "intended to provide a simpler way to serve process abroad, to assure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698, 108 S. Ct. 2104, 2108, 100 L. Ed. 2d 722 (1988). The treaty requires each signatory to establish a central authority that receives international service requests and thereafter serves documents "by a method prescribed by the internal law of the receiving state or by a method designated by the requester and compatible with that

-20-

law." *Id.* at 699, 108 S. Ct. at 2107. By virtue of the Supremacy Clause of the Constitution of the United States, Article VI, the Convention "preempts inconsistent methods of service prescribed by state law in all cases in which it applies." *Id.* at 699, 108 S. Ct. at 2108.

The parties agree that Ramos is a citizen of Mexico. The United States and Mexico are signatories of the Hague Convention. Service through Mexico's Central Authority is the exclusive method of service of process on parties in Mexico under the Hague Convention. *Compass Bank v. Katz*, 287 F.R.D. 392, 397 (S.D. Tex. 2012) (citing *Opella v. Rullan*, No. 10-21134-CIV, 2011 WL 2600707, at *5 (S.D. Fla. 2011) (unpublished)) (some citations omitted).[9]

In *Volkswagenwerk*, the United States Supreme Court, applying Illinois' general long-arm statute, held that whether there is occasion to transmit documents abroad must be determined by reference to the forum state's law. 486 U.S. at 700-01, 108 S. Ct. at 2108-09. "If the internal law of the forum state defines the applicable method of serving process as requiring the transmittal of documents abroad, then the Hague Service Convention applies." *Id.* at 700, 108 S.

---

[9] At oral argument, the Estate argued, for the first time, that Mexico has never formally objected to direct service by mail on an individual, citing *Unite National Retirement Fund v. Ariela, Inc*, 643 F. Supp. 2d 328, 334 (S.D.N.Y. 2008). This argument was not raised below and is deemed waived. Furthermore, as a general rule, a party should request leave to cite additional authority which was not cited in the appellate briefs. And finally, that case was based on a mistranslation of the Mexican Declaration. The prevailing interpretation is that Mexico has objected to service on individuals through postal channels. *See*, *e.g.*, *Mitchell v. Volkswagen Grp. of Am., Inc.*, 753 F. Supp. 2d 1264, 1271 (N.D. Ga. 2010).

Ct. at 2108. The Illinois long-arm statute authorized a plaintiff to serve the defendant's domestic subsidiary without sending the documents to the foreign corporation. Consequently, the Court held that "[w]here service on a domestic agent is valid and complete under both state law and the Due Process Clause, our inquiry ends and the Convention has no further implications." *Id.* at 707, 108 S. Ct. at 2112.

In the current case, KRS 188.020 authorizes service on a non-resident motorist through the Secretary of State. Nevertheless, such service is subject to the provisions of KRS 454.210(3)(c). That section requires the Secretary of State to, "within seven (7) days of receipt thereof in his office, mail a copy of the summons and complaint to the defendant at the address given in the complaint." *Id.* Unlike in *Volkswagenwerk*, service upon the statutorily-designated agent does not constitute complete service. Rather, the statute requires an additional mailing to the nonresident defendant. That requirement implicates the provisions of the Hague Convention. *See Quinn v. Keinicke*, 700 A.2d 147, 154 (Del. Super. Ct. 1996).

Consequently, we agree with the trial court that the Estate was obligated to comply with the provisions of the Hague Convention to effect complete service on Ramos. Since it did not, the trial court properly quashed the initial service of process on him. Therefore, Ramos was not before the court.

The Estate further notes that Chapa was later deemed to have admitted that Ramos was acting as its employee or agent. The Estate later attempted to serve Ramos at Chapa's Texas address. As a result, the Estate maintains that this service was sufficient to bring Ramos before the court. However, the admission can only be binding as to Chapa and was not sufficient to establish Ramos' residency in Texas or excuse compliance with the provisions of the Hague Convention. Under the circumstances, we agree that the trial court properly quashed this service on Ramos as well.

## V. ALLSTATE'S OWNERSHIP OF THE TOYOTA

The Estate next challenges the trial court's summary judgments on the issues relating to the insurers' ownership of the vehicles. "[T]he proper function of summary judgment is to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03.

"The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest*, 807 S.W.2d at 480. "The trial court must examine the evidence, not to decide any issue of fact, but to discover if a real issue exists." *Id.* On the other hand, "a party opposing a properly supported summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Id.* at 481. Since a summary judgment involves no fact-finding, this Court's review is *de novo*, in the sense that we owe no deference to the conclusions of the trial court. *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996).

The Estate argues that Allstate, Hartford, and Co-part failed to comply with their respective statutory duties prior to transferring the titles of the vehicles to AUF and giving possession of the vehicles to Ramos. Consequently, the Estate maintains that each remained responsible for insuring the vehicles at the time of the accident. With respect to the Toyota, the Estate contends that Allstate failed to comply with Maryland law in transferring title and possession of the vehicle. Consequently, the Estate argues that Allstate was still the owner of the Toyota and was required to provide insurance coverage.

The parties agree that the transfer of the Toyota's title is governed by Maryland law. There is also no dispute that the Toyota met the definition of

-24-

"salvage" under MD. CODE ANN., TRANSP. § 11-152(a)(2) (West 2021); that the title was properly transferred to Allstate from its insured pursuant to Section 13-112(a); and that Allstate properly applied for and obtained a Certificate of Salvage pursuant to Section 13-506.1. Rather, the issue is whether Allstate properly transferred the title to AUF.

The procedures for obtaining a Maryland Certificate of Salvage are set out in Section 13-506.1, but that section does not address the procedure required to transfer title of a salvage vehicle. The Estate points to Section 13-507, which addresses the issuance of a certificate of title of a vehicle for which a salvage certificate has been issued. The Estate argues that Allstate was required to obtain a certificate of title under this section prior to transferring the vehicle to AUF.

However, Section 13-507 includes provisions requiring the inspection of the vehicle prior to issuance of a new certificate of title and a notation on the certificate that it is a rebuilt salvage vehicle. Consequently, this section only applies prior to the transfer of a rebuilt salvage vehicle and not to all transfers of salvage vehicles. Furthermore, we agree with the trial court that the assignment of the certificate is governed by Section 13-112. That section requires that the seller execute the "Assignment of Ownership" section on the certificate and deliver the certificate to the buyer at the time of delivery of the vehicle.

As discussed above, Allstate followed this process in its sale of the Toyota. It executed the "Assignment of Ownership" section on the back of the Certificate of Salvage. Allstate then delivered the certificate to AUF's designated agent, Bubio, and possession of the vehicle to its designated agent, Ramos. Therefore, we agree with the trial court that Allstate's obligation to insure the Toyota ended at that point.

## VI.    HARTFORD'S OWNERSHIP OF THE JEEP

Similarly, the Estate argues that Hartford remained the owner of the Jeep for insurance purposes. The parties agree that the transfer of the Jeep was subject to Kentucky law. And as with the Toyota, there is no dispute that Hartford was issued a salvage title to the Jeep upon exchanging the title, which it received from its insured.

Hartford alleges that it transferred the Jeep's salvage title to Co-part. But the record reflects only that Co-part executed the dealer assignment on the certificate of title. Co-part was authorized to execute the title based on the limited power of attorney which Hartford had granted it. The power of attorney would not have been necessary if Hartford had transferred to title to Co-part. Thus, the salvage title remained in Hartford's name until the transfer to AUF on March 2, 2012.

"Kentucky is a certificate of title state for the purposes of determining ownership of a motor vehicle and requiring liability insurance coverage." *Potts v. Draper*, 864 S.W.2d 896, 898 (Ky. 1993). *See also* KRS 186.010(7)(a), defining "owner" to mean "a person who holds the legal title of a vehicle or a person who pursuant to a *bona fide* sale has received physical possession of the vehicle subject to any applicable security interest." However, KRS 186A.220(5) "created an exception to the general statutory scheme that makes the title holder the owner of a vehicle for insurance purposes." *Auto Acceptance Corp. v. T.I.G. Ins. Co.*, 89 S.W.3d 398, 401 (Ky. 2002). Specifically, if the dealer chooses to retain the title documents and deliver them directly to the county clerk, then "the dealer shall require from the purchaser proof of insurance as mandated by KRS 304.39-080 before delivering possession of the vehicle." KRS 186A.220(5)(b). *See also Travelers Indem. Co. v. Armstrong*, 565 S.W.3d 550 (Ky. 2018).

The issue in this case is whether Hartford, or its agent Co-part, was required to obtain proof of insurance prior to delivering possession of the Jeep to Ramos. As noted, Hartford chose to deliver the title documents to AUF's agent, Bubio, prior to delivering possession of the vehicle to Ramos. Consequently, neither Hartford nor Co-part was subject to the insurance-verification requirement.

The Estate separately argues that neither Allstate nor Hartford ever verified that Ramos was acting as an agent for AUF. The Estate points to Chapa's

deemed admission that Ramos was acting as its agent, suggesting that such an admission would preclude a finding that Ramos was also acting as AUF's agent. In such circumstances, the Estate suggests that Allstate and Hartford would be liable for negligent entrustment of the vehicles to an individual who was not an authorized agent of the title holder.

We disagree that these facts are relevant. Ramos' status as an agent for Chapa would not preclude a finding that he was also acting as an agent for AUF. Furthermore, Ramos provided AUF's member number and the lot number of both the Toyota and the Jeep prior to delivery of the vehicles. There is no suggestion in the record that Ramos was not authorized to take possession of the vehicles on AUF's behalf.

## VII. INSURERS' LIABILITY FOR NEGLIGENCE AND NEGLIGENT ENTRUSTMENT

For similar reasons, we conclude that Co-part was not obligated to obtain proof of insurance from Ramos prior to releasing the vehicles to him. The insurance-verification requirement of KRS 186A.220(5)(b) only applies if a dealer wishes to effectively transfer ownership of a vehicle without simultaneously transferring possession of the certificate of title. *See Gainsco Companies v. Gentry*, 191 S.W.3d 633, 636 (Ky. 2006). The requirement does not apply where, as here, Allstate and Hartford transferred the titles to AUF prior to Co-part releasing possession of the vehicles to Ramos.

However, the trial court found that there were genuine issues of material fact whether Co-part negligently entrusted the vehicles to Ramos. The Estate argues that, since Co-part was acting as an agent of Allstate and Hartford, respectively, any negligence by Co-part should be imputed to the insurers. Under the circumstances presented in this case, we disagree.

"The common law theory of negligent entrustment is that one who entrusts his vehicle to another whom he knows to be inexperienced, careless, or reckless . . . is liable for the natural and probable consequences of the entrustment." *McGrew v. Stone*, 998 S.W.2d 5, 9 (Ky. 1999) (Cooper, J., dissenting). Logically, one cannot maintain a negligent entrustment suit against the former owner of a vehicle who properly transferred ownership of the subject vehicle. *See Graham v. Rogers*, 277 S.W.3d 251 (Ky. App. 2008). Since Co-part sold and delivered the vehicles as an agent for Allstate and Hartford, the Estate argues that the insurers remain liable for any negligence by Co-part.

The Estate's claims against Allstate arise out of actions taken by Co-part at its Maryland facility. The Estate does not point to any significant nexus which would support applying the Kentucky law of negligent entrustment to Allstate. Furthermore, the Estate did not attempt to assert a claim for negligent entrustment under Maryland law. Consequently, we have no basis to assign liability to Allstate for any negligence by Co-part occurring in Maryland.

Hartford responds that Co-part was only operating as its agent for the limited purpose of executing the title transfer documents. In all other respects, Hartford asserts that Co-part was functioning as an independent contractor. We agree.

A principal is liable for the negligent acts of its agent "but generally is not held liable for the conduct of an independent contractor." *Nazar v. Branham*, 291 S.W.3d 599, 606 (Ky. 2009).

> An individual is the agent of another if the principal has the power or responsibility to control the method, manner, and details of the agent's work. If, however, an individual is free to determine how work is done and the principal cares only about the end result, then that individual is an independent contractor.

*Id.* at 606-07 (citations omitted). Factors the court should consider include the following:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;
>
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>
> (d) the skill required in the particular occupation;
>
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

*Kentucky Unemployment Ins. Comm'n v. Landmark Cmty. Newspapers of Kentucky, Inc.*, 91 S.W.3d 575, 579 (Ky. 2002). Although the "chief criterion is the right to control the details of the work[,]" no single factor is determinative. *Id.* at 580 (citations omitted). Each case must be decided on its own facts. *Id.*

Under the terms of its contract with Hartford, Co-part had sole control over the sale and delivery of the vehicle. As a result, Harford had no ability to determine whether Ramos intended to safely transport the salvage vehicles. Therefore, we conclude that Co-part was functioning as an independent contractor, and Hartford is not liable for any negligence by Co-part.

With respect to Co-part, the trial court found that "it is not unreasonable to expect a dealer to do more than simply deliver a vehicle that has been marked as 'not drivable' or 'not towable' to a 'bullpen' for the buyer to remove from the premises without some verification of the method of removal."

There were significant issues of fact whether Co-part knew or should have known how Ramos intended to transport the Jeep. As a result, the negligence and negligent entrustment claims against Co-part were properly submitted to the jury.

## VIII. DENIAL OF MOTIONS TO FILE AMENDED COMPLAINTS

### A. *Amended complaint against Allstate, Hartford, and Co-part alleging joint liability*

Along similar lines, the Estate argues that the trial court abused its discretion by denying its May 2014 motion to file an amended complaint. In that complaint, the Estate alleged that Co-part, Allstate, and Hartford were engaged in a joint venture, joint enterprise, or partnership. Based on this arrangement, the Estate asserts that the amended complaint properly stated a claim for joint and several liability between and among Co-part, Allstate and Hartford. *See Abbott v. Chesley*, 413 S.W.3d 589, 604 (Ky. 2013). The Estate further maintains that none of the named parties would have been prejudiced by allowing the amended complaint because discovery was still ongoing at that point.

Kentucky law is clear that the decision to amend a complaint falls within the trial court's discretion. *Kenney v. Hanger Prosthetics & Orthotics, Inc.*, 269 S.W.3d 866, 869-70 (Ky. App. 2007). CR 15.01 provides that "a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." In determining whether to grant a motion to amend a party's complaint, a trial court "may consider

-32-

such factors as the failure to cure deficiencies by amendment or the futility of the amendment itself." *First Nat'l Bank of Cincinnati v. Hartman*, 747 S.W.2d 614, 616 (Ky. App. 1988). Other factors include whether amendment would prejudice the opposing party or would work an injustice. *See Shah v. Am. Synthetic Rubber Corp.*, 655 S.W.2d 489, 493 (Ky. 1983). Ultimately, whether a party may amend his complaint is discretionary with the trial court, and we will not disturb its ruling unless it has abused its discretion. *Kenney*, 269 S.W.3d at 869-70.

Under the circumstances, we find no abuse of discretion. Although the amended complaint was not untimely, we conclude that the Estate failed to assert a viable claim that the parties were engaged in a joint venture or partnership. Allstate and Hartford separately contracted with Co-part to facilitate the sale of damaged vehicles. As discussed above, Co-part functioned as an independent contractor in the sale of such vehicles with a limited agency to execute the title documents. Unlike in *Abbott v. Chesley*, *supra*, there is no allegation that they shared the common pecuniary purpose of the venture; that they shared the work and profits of the enterprise; or that each maintained a voice in the managerial control of the enterprise. 413 S.W.3d at 604. In the absence of such allegations, the trial court was not obligated to allow filing of the amended complaint.

-33-

*B. Amended complaint against Liberty Mutual*

Following the trial in this matter, the Estate attempted to file an amended complaint against Liberty Mutual. The Estate sought a declaratory judgment that Co-part's insurance policy covered the liabilities of Chapa, Ramos, and AUF. The trial court denied the motion, holding that Liberty Mutual was never on notice that it would be required to provide a defense for these parties. We agree.

As discussed above, Ramos was never properly served and was not before the court. As a non-settling non-party, he was not subject to any apportionment of fault. KRS 411.182. But since he was deemed to be an agent of Chapa, his negligence was properly considered to the extent that Chapa is vicariously liable for his actions. However, the Estate has not identified any basis to extend Co-part's liability insurance to cover the actions of Chapa or its agents. Even if it had, we agree with the trial court that Liberty Mutual had no reasonable expectation that it would be required to assert a defense for Chapa or Ramos under its policy with Co-part.

We also note that the Estate did not attempt to assert its own claim against AUF until after the trial. AUF was only before the court on Co-part's third-party complaint. Consequently, AUF can only be liable for its own share of damages attributable to Co-part's negligence. In light of the untimely filing and

-34-

the lack of any basis to assert liability against Liberty Mutual, the trial court did not abuse its discretion by denying the Estate's motion to file an amended complaint.

## IX.    SCOPE OF CO-PART'S LIABILITY FOR STATUTORY VIOLATIONS

In addition to the negligence and negligent entrustment claims, the Estate further argues that Co-part was subject to liability for violations of statutory duties.  It is well-settled that the interpretation of a statute presents an issue of law for the court, and our review proceeds *de novo*.  *City of Worthington Hills v. Worthington Fire Prot. Dist.*, 140 S.W.3d 584, 591 (Ky. App. 2004).  "When interpreting a statute, the intent of the legislature is paramount and controls[,]" and "words are afforded their ordinary meaning unless a contrary intent is apparent." *Wahlke v. Pierce*, 392 S.W.3d 426, 430 (Ky. App. 2013) (citing *Old Lewis Hunter Distillery Co. v. Ky. Tax Comm'n*, 302 Ky. 68, 193 S.W.2d 464 (1945)).

A. *Statutory duties applying to "owners" and "operators"*

The duties imposed under KRS 186A.065 and 189.100 apply to "owners" of motor vehicles.  Since Co-part was never an owner of either the Toyota or the Jeep, it cannot be liable for violations of these sections.  Likewise, the duties imposed under KRS 186A.065 and 189.290 apply to an operator of a motor vehicle.  Co-part was not an operator of either the Toyota or the Jeep within

-35-

the meaning of KRS 186.010(6). Therefore, the trial court did not err by granting summary judgment and dismissing the Estate's claims based on these statutes.

B. *Statutory duties applying to dealers*

As discussed above, KRS 186A.220(5) did not obligate Co-part to obtain proof of insurance when it transferred possession of the Jeep to Ramos. However, the authority interpreting KRS 186A.220(5) is relevant to the Estate's claim that Co-part violated KRS 186A.100. That section requires a motor vehicle dealer licensed to sell a vehicle for use upon the highways of this state to equip the vehicle with a temporary tag. The trial court took the position that, since the vehicles had salvage titles and could not lawfully be operated on the highways, AUF was not a "purchaser for use" within the meaning of KRS 186A.220(5). Similarly, Co-part argues that KRS 186A.100 was not applicable because it did not sell the Jeep "for use."

In *Travelers*, 565 S.W.3d 550, the Supreme Court interpreted the meaning of a purchaser "for use" with regard to the insurance-verification requirement. The Court found that the meaning of that term is unclear, as "[i]t could mean an active 'use' as in driving; it could mean a passive 'use' as in buying for investment purposes." *Id.* at 559. However, the Court also concluded that the term must be interpreted in light of the legislature's intent to establish an efficient system of sale and registration, while still protecting operators from uninsured

drivers. *Id.* at 559-60. Based upon the statutory scheme, the Court concluded that the term "purchaser for use" means "consumer," but not a "purchaser for resale," such as a dealer-to-dealer transaction. *Id.* at 562-63.

For purposes of the statute, AUF must be considered a consumer and thus a purchaser for use. While there is some indication that AUF operates as a salvage and parts dealer in Mexico, there is no evidence that AUF is licensed to operate as a motor vehicle dealer anywhere in the United States. AUF only purchased the vehicles as an individual.

Nevertheless, Co-part is liable for violation of this section only to the extent that the Jeep was required to display a license plate. The trial court took the position that, since a license plate is not issued for a vehicle with a salvage title, such a vehicle need not display a plate as long as it is in tow. Furthermore, Co-part required purchasers to obtain license plates for any vehicles which were intended to be operated on the highways. Although the three-day permits obtained by Ramos did not authorize him to operate the vehicles on the highway outside of Arizona, there is at least a factual question whether Co-part reasonably believed the permits were sufficient. Likewise, there is a factual issue whether Co-part was aware or should have been aware that Ramos intended to use the Jeep in a manner requiring the display of a valid license plate. For these reasons, we conclude that the Estate was entitled to submit this statutory claim to the jury.

-37-

*C. Whether Ramos "operated" the Jeep on Kentucky highways*

This leads us to the Estate's claim that Co-part is liable for violation of KRS 189.224, which provides that it is unlawful for an owner, or *any other person* "to require or knowingly to permit the operation of such vehicle upon a highway in any manner contrary to law."[10]  Although the trial court initially denied Co-part's motion for summary judgment on the application of KRS 189.224, it eventually declined to instruct the jury on the statutory violation.  The court concluded that a towed vehicle was not being "operated" for purposes of the statute.  The Estate argues that it is entitled to assert this claim because Ramos was operating both the Jeep and the Toyota.

For purposes of this section, the relevant inquiry is whether Co-part knowingly permitted the operation of the Jeep on the highway.  KRS 186.010(6) defines "operator" as "any person in actual control of a motor vehicle upon a highway."  Under this definition, Ramos was clearly the "operator" of the Toyota-Jeep combination, since he was the only person in actual control of both vehicles.  It is undisputed that neither the Toyota nor the Jeep could be lawfully "operated"

---

[10] The Estate also asserts Co-part is subject to liability under KRS 189.226.  However, that section imposes criminal penalties for violation of KRS 189.221 to 189.228.  Because the statute is silent as to civil liability, we conclude that violations of these sections are relevant only to establish a statutory duty under which a person may liable.

-38-

on the highways in Kentucky.  The question, however, is whether the Jeep was being "operated" on the highway in violation of KRS 186A.520.

The question is relevant because Co-part's liability is founded upon whether it knowingly permitted Ramos to operate the Jeep on the highways of the Commonwealth.  The trial court concluded that the plain meaning of the term "operated" requires "more affirmative action than just connecting it by means of a tow bar to another vehicle."

We disagree with the trial court's reasoning.  The Toyota and the towed Jeep constituted a single unit, and both were being "operated" for purposes of KRS 189.224 and 186A.520(6).  *See also* KRS 189.060 (setting forth requirements for vehicles used as a towing unit).  Furthermore, such vehicle combinations are generally considered a single unit for purposes of insurance coverage.  *See State Auto. Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 456 F.2d 238 (6th Cir. 1972).  Co-part argues that interpreting "operated" in this manner would reach an absurd result – prohibiting any salvage vehicle from being towed and requiring all such vehicles to be transported off the roadway, such as via a car carrier, flatbed, or trailer.

However, we do not need to determine whether all vehicles being towed are "operated" on the highways within the meaning of the statute.  Co-part's statutory duties do not require it to prevent salvage vehicles from being operated

on the roadways. Those duties only require that it not knowingly permit vehicles to be operated in a manner contrary to law. We do not believe that every vehicle being towed by another vehicle is being "operated" for purposes of KRS 189.224. However, the tow-bar combination employed by Ramos clearly falls within the meaning of "operating" both vehicles. Under the circumstances, we conclude that the Estate was entitled to a jury instruction on this statutory claim.

## X.   DISMISSAL OF ESTATE'S CLAIM AGAINST CO-PART'S EXECUTIVES

As noted above, the Estate asserted claims against Johnson, Styer, and Franklin for negligent hiring, supervision and training of Co-part's employees. As a general rule, a director or officer is not personally liable for the torts of a corporation merely by reason of his official character. *Smith v. Isaacs*, 777 S.W.2d 912, 913-14 (Ky. 1989). Nevertheless, an agent of a corporation may be personally liable for a tort committed by him although he was acting for the corporation. *Id.* at 914 (citing *Peters v. Frey*, 429 S.W.2d 847, 849 (Ky. 1968)). The trial court dismissed the claims, holding that they were not liable individually for corporate negligence.

The Estate argues that Johnson, Styer, and Franklin are personally liable for negligent supervision and training of the Louisville Co-part employees. The Estate asserts that the corporate officers breached their duties to train the Louisville Co-part employees to make sure that vehicles left the facility in a safe

and legal manner. However, the Estate does not point to any evidence that Johnson, Styer, or Franklin were actively involved in the hiring or training of the Louisville employees. Furthermore, the Estate does not show that the corporate officers breached duties which they owed in their individual capacities. Therefore, the trial court did not err in granting summary judgment on this issue.

## XI. EVIDENTIARY AND TRIAL ISSUES

The Estate focuses on several evidentiary issues which arose both before and during trial and which affected its claims against Co-part. The Estate challenges the trial court's rulings to admit or exclude certain evidence at trial. We review the trial court's decision to admit or to exclude evidence for abuse of discretion. *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000). The trial court abuses its discretion when its decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* at 581.

### A. Co-part's withdrawal of admission that Ramos "drove out" the Toyota from the Maryland facility

The most significant evidentiary issue concerns the trial court's December 1, 2015 order allowing Co-part to withdraw and amend an admission. During the early stages of discovery, Co-part responded to the Estate's requests for admission, admitting that Ramos "drove out" the Toyota from its Maryland facility. After the completion of discovery, Co-part moved to withdraw the admission, arguing that it had made the admission in error. The trial court allowed

-41-

Co-part to withdraw the admission. The Estate argues that it was prejudiced by the untimely withdrawal of the admission because it was unable to conduct additional discovery on the matter prior to trial.

A judicial admission "is a formal act by a party in the course of a judicial proceeding which has the effect of waiving or dispensing with the necessity of producing evidence by the opponent and bars a party from disputing a proposition in question." *Nolin Production Credit Ass'n v. Canmer Deposit Bank*, 726 S.W.2d 693, 701 (Ky. App. 1986). A court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits. CR 36.02. The party who obtained the mistaken admission has the burden of proving prejudice. *Buridi v. Leasing Grp. Pool II, LLC*, 447 S.W.3d 157, 176 (Ky. App. 2014). "The necessity of having to convince the trier of fact of the truth of a matter erroneously admitted is not sufficient." *Id.* (citation omitted).

Co-part correctly notes that it retained the right under CR 36.01 to explain or clarify its response concerning the subject matter. *Berrier v. Bizer*, 57 S.W.3d 271, 280 (Ky. 2001). However, that right is generally exercised after a jury has been informed of the admission by the examination or cross-examination

of witnesses produced at trial. *Id.* Here, the trial court allowed Co-part to withdraw the admission, so it could not have been introduced at trial.

The Estate argues that it was prejudiced by Co-part's withdrawal of the admission because the discovery deadline had already passed. The Estate asserted that it relied on that admission by declining to conduct additional discovery on the issue. In rejecting this claim of prejudice, the trial court pointed to the April 17, 2014 deposition of Co-part's corporate representative, Aron Rosenfield. Rosenfield stated that he believed the term "drove out" on the receipt for the Toyota indicated that a Co-part employee had driven the Toyota to the delivery area, rather than using a forklift to bring it. He did not believe that the receipt supported an inference that Ramos had driven the Toyota away from the Co-part facility.

Based upon this deposition testimony, the trial court found that the Estate was on notice since at least April 2014 that there was a dispute whether Ramos physically drove the Toyota from the Maryland facility. The trial court concluded that the Estate would not be unfairly prejudiced by withdrawal of the admission because the Estate had the opportunity to seek discovery on that issue prior to that time. We disagree.

First, although the Estate may have been on notice that Co-part would dispute the meaning of the term "drove out" on the Toyota receipt, it was entitled

to rely on the contrary admission at least until Co-part made the motion. By waiting until the discovery deadline had passed to make this motion, Co-part severely limited the Estate's options to conduct additional discovery on the issue. At the very least, the trial court failed to address the prejudice caused by Co-part's failure to seek an earlier withdrawal of the admission.

Furthermore, we conclude that the admission was relevant to the Estate's claims for negligence and negligent entrustment and to its statutory claim under KRS 189.224. We agree with the trial court that Co-part's conduct in Maryland is not actionable in this case. However, that conduct remained relevant to determine Co-part's knowledge that Ramos intended to operate the Toyota/Jeep combination illegally on Kentucky highways. Consequently, the withdrawal of the admission clearly impacted the Estate's negligence claims, and its statutory claim under KRS 189.224, which we have found that the trial court erred by dismissing. Under the circumstances, we conclude that the trial court abused its discretion by allowing Co-part's untimely motion to withdraw the admission.

However, the remedy for this error is to remand the matter for a new trial. Co-part's withdrawal of the admission is significant only to the extent that the Estate was unable to seek additional discovery on the issue. In addition, the trial court must also evaluate whether "the presentation of the merits of the action will be subserved" by withdrawal or amendment. *Buridi*, 447 S.W.3d at 175

(citing CR 36.02). Upon remand, the trial court may again consider whether the interests of justice would be served by allowing Co-part to withdraw the admission. But if it does so, then it must allow the Estate to conduct limited discovery on this issue prior to retrial.

   B. *Exclusion of evidence of Savage's SSD benefits as part of the Estate's claim for destruction of his power to earn money*

Because we are remanding this matter for a new trial, we will address the remaining issues only to the extent that they remain at issue. The trial court held that the Estate could not present evidence of Savage's receipt of SSD benefits as part of its claim for the destruction of Savage's power to earn money. At the time of his death, Savage was suffering from degenerative disk disease and osteoarthritis. He was unable to work outside the home, and he had been receiving SSD benefits since 2008. Co-part moved to exclude any evidence of those benefits, arguing that, since Savage was unable to work outside the home, the Estate could not claim that he had lost any future income. The trial court agreed and excluded the evidence.

In support of this conclusion, Co-part points to *Aull v. Houston*, 345 S.W.3d 232 (Ky. App. 2010), in which a panel of this Court noted that "[t]he measure of damages in a wrongful death action . . . is the damage to the estate by the destruction of the decedent's power to labor and earn money." *Id.* at 235 (citation and emphasis omitted). In a case where the decedent was totally disabled

-45-

and had no power to earn money, the Court concluded that the measure of damages would be zero. *Id.* at 236. Thus, the Court held that the jury was not authorized to consider the decedent's eligibility to receive SSD benefits. *Id.* at 236-37.

We question whether *Aull* should be broadly read to exclude receipt of SSD benefits from economic losses in all wrongful death actions. *Aull* involved the alleged wrongful death of a child who received immunizations at the age of five which purportedly caused his death. Notably, the child had earlier been diagnosed with a profoundly disabling condition with a poor prognosis. The trial court granted a partial summary judgment ruling that damages could not be recovered for the destruction of power to earn money because the evidence was undisputed that the child was incapable of ever earning money from his own labor. *Id.* at 234. This Court affirmed, holding, "the inference that [the child], someday, would have the ability to 'earn' money is simply, and sadly, unreasonable. It was not error for the trial court to conclude that [the child] was unable to earn money" by his own labor. *Id.*

Unlike in *Aull*, Savage's receipt of SSD benefits was not merely speculative. His benefits were based upon his actual work history and loss of earning capacity. Furthermore, while Savage was totally disabled from his prior employment, he was not entirely disabled as was the child in *Aull*. Indeed, the Estate points to evidence that Savage was able to do extensive work around the

house, which would be indicative of at least some earning capacity. Finally, in other contexts, SSD benefits replace income which is lost before retirement and are treated in the same manner as income. *See Holman v. Holman*, 84 S.W.3d 903, 910 (Ky. 2002) (treating disability benefits as a replacement for lost future income and thus not divisible as marital property). For these reasons, we believe that the holding of *Aull* should be limited to the factual circumstances presented in that case.

Nevertheless, the Court in *Aull* did not limit its holding to the facts of the case. Rather, the Court held that damages in a wrongful death claim must be based on the destruction of the decedent's power to labor and earn money. *Aull*, 345 S.W.3d at 236-37. The Court also broadly stated that, since a person does not "earn" disability benefits, the loss of such benefits is not the equivalent of a destruction of the decedent's power to labor and earn money. *Id.* at 236-37. This holding was consistent with earlier Kentucky authority holding that where a decedent had no capacity to earn money at the time of his death, there is no economic loss to recover. *See Turfway Park Racing Ass'n v. Griffin*, 834 S.W.2d 667, 671 (Ky. 1992) and *Smith v. McCurdy*, 269 S.W.3d 876, 882 (Ky. App. 2008).

Unless the Supreme Court decides to modify this categorical rule, we must conclude that the trial court did not abuse its discretion by excluding evidence

of Savage's SSD benefits from the Estate's wrongful death claim. Thus, on remand, the jury is not entitled to consider evidence of those benefits. However, we disagree with the trial court that the receipt of SSD benefits necessarily requires a finding that Savage was totally disabled from any employment at the time of his death. Consequently, the jury may consider other evidence of Savage's residual earning capacity. Furthermore, the trial court may again allow the jury to consider evidence of the value of household services which Savage provided.

### C. *Exclusion of evidence of payments made by Liberty Mutual to Co-part's expert to show bias*

The Estate next argues that the trial court improperly excluded evidence that Co-part's experts, Sayre, Hawes, and Kirk, were paid by its insurer, Liberty Mutual. Although evidence of liability insurance is not admissible to prove negligence, it is admissible for other reasons, including to show the bias or prejudice of a witness. KRE[11] 411. Thus, as a general rule, evidence that an expert witness has been employed by an insurance company is admissible to show bias of the witness. *Woolum v. Hillman*, 329 S.W.3d 283, 287 (Ky. 2010). *See also Hedger v. Davis*, 236 Ky. 432, 33 S.W.2d 310, 311 (1930).

But in the current case, the evidence showed that the experts were retained and paid by Co-part through its counsel. While the evidence of their

---

[11] Kentucky Rules of Evidence.

pecuniary interest was relevant to show bias, the ultimate source of the funds was not. Moreover, the witnesses were subject to cross-examination to determine that they were retained on Co-part's behalf, without any need to mention a possible involvement by Liberty Mutual. Therefore, we agree with Co-part that any relevance of Liberty Mutual's involvement in compensating the expert witnesses was far outweighed by the unfairly prejudicial effect. KRE 403. On remand, the Estate is entitled to cross-examine the witnesses about their compensation for their testimony but not about any involvement by Liberty Mutual.

### D. Exclusion of evidence of Hartford's and Allstate's roles in the vehicle sales

The Estate next contends that the trial court abused its discretion by excluding evidence of Allstate's and Hartford's roles in the vehicle sales. But since the trial court correctly found that Hartford and Allstate were not liable for their own negligence or for Co-part's alleged negligence, that evidence was not relevant to the issues at trial. Therefore, we find no abuse of discretion.

### E. Exclusion of the MVC Dealer Handbook and Advice to Newly Licensed Dealers

In its pre-trial order, the trial court denied the Estate's motion to permit introduction of information from the MVC's *Dealer Handbook* and *Advice to Newly Licensed Dealers*. The Estate argues that the documents were admissible to explain Co-part's duties as a used car dealer. The trial court disagreed, holding that the documents were not admissible because "salvage vehicles by definition are

-49-

not used cars since they are not intended to be driven on the road, and not intended to place any person in danger of injury or damage."

We disagree with the trial court's reasoning that the Jeep's salvage title was the sole basis to determine whether Co-part's duties as a used car dealer were implicated. As discussed above, the controlling issue is whether Co-part negligently entrusted the Jeep to Ramos or knowingly permitted Ramos to operate the Jeep on Kentucky highways. But while these issues encompass some of Co-part's duties as a used car dealer, Co-part's alleged negligence does not arise directly from its statutory duties as a used car dealer. Given the likelihood for confusion of issues, the trial court did not abuse its discretion by excluding the MVC documents.[12] But on remand, the Estate should be permitted to introduce expert testimony concerning the full extent of Co-part's applicable duties, whether common-law or statutory.

---

[12] We also note the MVC *Handbook* and *Advice* are only intended as a guide to automobile dealers rather than a primary authority establishing statutory duties. Expert testimony is necessary to establish those duties and the breach thereof. And even supplemented by expert testimony, these publications are not authoritative to establish the underlying duties.

*F. Trial court's rulings regarding admissibility of testimony by expert witnesses*

    *1. Exclusion or limitation of the Estate's experts*

The Estate raises several issues relating to the admission of the testimony of Co-part's expert witnesses and the exclusion or limitation on the testimony of its expert witnesses. The Estate first argues that the trial court improperly excluded or limited the testimony by its experts, Larry Craig, Scott Burrows, Sam Cromity, and Sonny Cease. The admission of expert testimony is governed by KRE 702 and the standard adopted by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), in evaluating the testimony of expert witnesses. *West v. KKI, LLC*, 300 S.W.3d 184, 193 (Ky. App. 2008). The *Daubert* decision established a procedure in which the trial court acts as a gatekeeper, ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. *Daubert*, 509 U.S. at 597, 113 S. Ct. at 2798. *See also Mitchell v. Commonwealth*, 908 S.W.2d 100 (Ky. 1995), *overruled on other grounds by Fugate v. Commonwealth*, 993 S.W.2d 931 (Ky. 1999).

The Estate argues that the trial court failed to conduct a *Daubert* hearing on the qualifications of the witnesses prior to excluding their testimony. Co-part responds that *Daubert* findings were unnecessary because the trial court excluded the experts based upon factors not related to their qualifications as

-51-

experts. In determining whether to admit expert testimony, a trial court must consider "whether the testimony is reliable, a factual determination, and whether the testimony will assist the trier of fact in understanding or determining a fact in issue, an admissibility determination." *Oliphant v. Ries*, 460 S.W.3d 889, 897 (Ky. 2015). We review the reliability determination for clear error and the admissibility determination for abuse of discretion. *Id.* We will address the trial court's rulings regarding each of the experts at issue.

a. Larry Craig

First, the Estate sought to introduce the testimony of Larry Craig, who serves on the MVC and has experience as a motor vehicle and used car dealer. Craig's testimony would have served as a foundation for the introduction of the MVC documents. He also would have testified about Co-part's duties as a used car dealer. Since we agree with the trial court that Co-part's duties as a used car dealer were not directly implicated, his testimony was not relevant to the matters at issue. The trial court also noted that the Estate's disclosures relating to Craig were inadequate under CR 26.02 because they failed to state the basis for his opinions. *See Clephas v. Garlock, Inc.*, 168 S.W.3d 389, 393 (Ky. App. 2004). Upon review of the record, we find that the trial court's conclusions did not amount to an abuse of its discretion.

b.  Scott Burrows

Second, the Estate planned to introduce Burrows' testimony to establish the standard of care with respect to towing vehicles.  Burrows owns a garage and wrecker service, and he served in various positions of the Towing & Recovery Association of Kentucky.  Based on this experience, Burrows was of the opinion that the Jeep was not towable.  He also opined that the Jeep exceeded the safe towing capacity of the Toyota even without the pre-existing damage.  Finally, he expressed the opinion that the towing apparatus used by Ramos was improperly installed and should not have been used to tow the Jeep.  In light of the damage to both vehicles, Burrows stated that the towing arrangement and the condition of the vehicles was a substantial factor in causing the accident.

Co-part raised several objections to Burrows' testimony, which the trial court adopted.  First, Co-part challenged Burrows' testimony about the safe towing capacity of the Toyota because he did not know the exact weight or engine capacities of either vehicle.  However, Burrows' disclosure states the he relied upon the manufacturers' specifications for each vehicle.  We disagree with the trial court's reasoning that this rendered Burrows' testimony speculative.  Co-part raises no objection to Burrows' qualification to express an opinion on the matter.  Furthermore, Co-part does not argue that Burrows lacked a proper foundation to rely on the specifications.  Consequently, Burrows' uncertainty about the exact

weights of the vehicles goes to the weight and credibility of his testimony, not its admissibility.

Second, the trial court excluded Burrows' testimony about the best practice guidelines for towing storage and impound lots because he failed to provide copies of the organizations' published guidelines. However, the purpose of disclosure under CR 26.02(4)(a) is to sufficiently apprise the opposing party of the substance of an expert witness' expected testimony. Full disclosure is essential to trial preparation. *Clephas*, 168 S.W.3d 389, 393-94. Here, Burrows provided his report as part of the CR 26.02(4) disclosure. He fully stated his qualifications and the bases for his opinions. We conclude that the failure to produce the guidelines at the discovery phase does not affect the admissibility of Burrows' testimony. Therefore, the trial court abused its discretion by excluding his testimony for this reason.

Finally, the trial court found that Burrows' testimony about the duties owed by towing and impound storage lots were not relevant to the issues at trial. But as discussed above, we conclude that the trial court erred by dismissing the Estate's statutory claims under KRS 186A.100 and 189.224. Burrows' testimony about the duties and standard of care owed by towing storage and impound lots concerning the release of vehicles were clearly relevant to those claims.

Consequently, the trial court abused its discretion by excluding these portions of his testimony.

On the other hand, his testimony about particular duties, such as the duty to ascertain that the operator of the motor vehicle to be removed is not under the influence of alcohol or drugs, may not be relevant based on the other evidence presented. Upon re-trial, the Estate must introduce the guidelines to the extent that Burrows intends to rely upon them. Furthermore, the trial court shall allow Burrows' testimony on these matters unless no adequate foundation is provided, or Co-part establishes that specific duties are not relevant to these claims, or such evidence would confuse the jury with matters not at issue.

c. Samuel Cromity

Third, the Estate sought to introduce the testimony of Samuel Cromity, a Louisville Metro Police officer who went to the scene of the accident to investigate. The trial court found that he could testify as a fact witness but had not been timely identified as an expert witness. The Estate takes issue with the lack of *Daubert* findings but does not identify what testimony of Cromity was improperly excluded.

d. Henry C. "Sonny" Cease

Finally, the Estate sought to introduce the testimony of Sonny Cease, a retired Kentucky State Police Major. He has testified in other cases as an

accident reconstructionist. The Estate intended to introduce his expert opinion that the tow-bar combination was unsafe and was a substantial factor in causing the accident.

The trial court excluded Cease's testimony that he "agreed" with Burrows' report and conclusions. Rather, the court held that Cease's opinions must be based upon his independent review and analysis. The Estate does not explain why this ruling was erroneous.

In its December 1, 2015, order, the trial court held that the Estate had not established Cease's qualifications to testify as an expert in the field of accident reconstruction or on safe towing of vehicles. In its May 20, 2016, order, the court declined to revisit this ruling but stated that it would revisit this conclusion at trial if the Estate "establishes Cease's expertise in specific areas such as towing and towed vehicles . . . ." The Estate provides no specific references to the record showing that it established Cease's qualifications in these areas. Therefore, we find no abuse of discretion.

2. *Admission of testimony by Co-part's expert witnesses*

The Estate next argues that the trial court should have excluded the testimony of Co-part's experts, Vince Sayre and Van Kirk, who both testified as experts in accident reconstruction. The Estate first argues that the trial court improperly allowed hearsay testimony to be used in the direct examination of

Sayre and Kirk and in the cross-examination of Cromity. In a related argument, the Estate argues that Sayre should have been excluded as an expert due to his reliance on this hearsay evidence.

The evidence at issue includes police photographs of the accident scene and witness statements included in the police report. The Estate contends that hearsay evidence consisted of witness statements in the police report. The Estate contends that Sayre's testimony can only be based on his personal observation and investigation and that his opinions are not admissible to the extent he relied upon facts or data outside of the direct scope of his knowledge.

Co-part responds that KRE 703 permits an expert to rely "on facts or data, including hearsay which would otherwise not be admissible into evidence, provided that it is of a type reasonably relied upon by experts in that field." *Combs v. Stortz*, 276 S.W.3d 282, 293 (Ky. App. 2009) (citing *Alexander v. Swearer*, 642 S.W.2d 896 (Ky. 1982)). In this case, Sayre testified that he visited the accident scene, viewed police photographs, personally inspected both the Toyota and the Jeep, and mapped the scene using the Total Station data points recorded by the investigating officers, including Cromity. The Estate fails to identify any improper assumptions included in Sayre's testimony. Likewise, the Estate does not show that the witness statements were used without a proper foundation. Therefore, we find no abuse of discretion.

The Estate also argues that the trial court should not have allowed Kirk to testify as an expert in the field of accident reconstruction. Kirk was qualified as an expert in the field of forensic mechanics. He expressed his opinion that the tow bar connecting the Toyota and the Jeep did not cause Ramos to lose control of the vehicles. He also stated that he did not find any problems with either the Toyota or the Jeep which contributed to the accident.

However, Kirk admitted that he had not performed a collision reconstruction in this case. The trial court admonished the jury to disregard any statements from Kirk concerning the cause of the accident to the extent that it relied upon witness statements about the movement of the vehicles. Since we are remanding this matter for a new trial, we direct the trial court to exclude any testimony which is outside of the scope of the area in which he was qualified as an expert.

G. *Admission of bulk medical records*

The Estate contends that the trial court erroneously allowed Co-part to introduce "bulk medical records" regarding Savage without testimony by a medical doctor. But other than including a preservation statement, the Estate does not explain what medical records were introduced or how it was prejudiced as a result. Given the Estate's failure to develop this argument, we decline to address the issue further.

*H. Admission of evidence regarding James Savage*

The Estate next argues that the trial court abused its discretion by allowing Co-part to introduce evidence that Savage was not wearing a helmet at the time of the accident. The Estate also objects to introduction of evidence that Savage was taking prescription medication and a toxicology report showing that he had hydrocodone in his system at the time of his death. Co-part contends that the jury could consider this evidence to determine whether Savage's failure to wear a helmet contributed to his injuries or whether he could have been impaired at the time of the accident. However, the trial court did not include an instruction apportioning any fault to Savage. Thus, we fail to see how this evidence was relevant to the matters at issue at trial. On remand, this evidence should be excluded unless Co-part establishes its relevance to the issues before the jury.

The Estate also objects to the introduction of evidence of Savage's prior accidents, his medical history, and drug use. Co-part argues this evidence was relevant to Lauren Savage's claim for loss of consortium. While we are concerned that such evidence could have been used as improper character evidence, the Estate does not point to anywhere in the record where Co-part attempted to use the evidence for an improper purpose. Under the circumstances, we conclude that this evidence was properly admitted.

## XII. DIRECTED VERDICT ISSUES

The Estate also argues that the trial court erred by denying its motion for a directed verdict on liability against Co-part and by granting Co-part's motion for a directed verdict on its claims for punitive damages.

> When a directed verdict is appealed, the standard of review on appeal consists of two prongs. The prongs are: '[A] trial judge cannot enter a directed verdict unless there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ.' *Bierman v. Klapheke*, 967 S.W.2d 16, 18-19 (Ky. 1998). "A motion for directed verdict admits the truth of all evidence which is favorable to the party against whom the motion is made." *National Collegiate Athletic Ass'n By and Through Bellarmine College v. Hornung*, 754 S.W.2d 855, 860 (Ky. 1988), citing *Kentucky & Indiana Terminal R. Co. v. Cantrell*, 298 Ky. 743, 184 S.W.2d 111 (1944).

*Daniels v. CDB Bell, LLC*, 300 S.W.3d 204, 215 (Ky. App. 2009).

A. *Denial of directed verdict on negligence and negligent entrustment claims against Co-part*

In its first argument, the Estate contends that Co-part and its employees were negligent as a matter of law in turning over salvage vehicles to buyers without determining whether the individual had a safe means of transporting them. As a result, the Estate argues that it was entitled to a directed verdict as to liability on its negligence and negligent-entrustment claims. Although we are remanding this matter for a new trial, we find that the Estate has not established Co-part's liability as to be entitled to a directed verdict on these claims.

It is well-established that a plaintiff seeking to prove a cause of action for negligence in Kentucky must show the existence of a duty, breach thereof, proximate causation, and damages. *Boland-Maloney Lumber Co., Inc. v. Burnett*, 302 S.W.3d 680, 686 (Ky. App. 2009) (citing *Illinois Central R.R. v. Vincent*, 412 S.W.2d 874, 876 (Ky. 1967); *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky. 1992)). The existence of a duty is a question of law for the court, while breach and injury are questions of fact for the jury. *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003). Causation presents a mixed question of law and fact. *Id.*

There are significant questions of fact whether Co-part breached any duties in Kentucky. In particular, the Estate is required to prove that Co-part and its employees entrusted the Jeep to Ramos knowing that he intended to tow it in the manner in which he did. In addition, the Estate must also prove that any negligence by Co-part was the proximate cause of Savage's injuries and death. If the same evidence is presented at retrial, the Estate has not shown it would be entitled to a directed verdict against Co-part on these claims.

The Estate also maintains that Co-part is subject to strict liability for any statutory violations. As discussed above, we conclude that there were issues of fact concerning the extent of Co-part's violations of its statutory duties. Furthermore, violation of a statute does not necessary create liability. *Hargis v.*

*Baize*, 168 S.W.3d 36, 46 (Ky. 2005). The statute must have been specifically intended to prevent the type of occurrence that took place, and the violation must have been a substantial factor in causing the result. *Isaacs v. Smith*, 5 S.W.3d 500, 502 (Ky. 1999). The Estate makes no showing that the legislature intended to impose strict civil liability for violations of the applicable statutory duties. As a result, the Estate remains obligated to prove that Savage's injuries and death resulted from Co-part's violations of the statutory duties.

### B. *Granting of directed verdict on the estate's claim for punitive damages*

The Estate also argues that the trial court erred by granting a directed verdict on its punitive damages claim against Co-part and by excluding any evidence relating to that claim. The Estate also asserts that trial court improperly excluded evidence of Co-part's prior practices, including evidence of the size and scope of its operations, its relationship with the insurers, its prior dealings with AUF, and its financial incentives to conduct business in the manner it does. The Estate maintains that the jury should have been allowed to consider this evidence to determine the appropriate amount of punitive damages.

An instruction on punitive damages is warranted if there is evidence that the defendant acted with oppression, fraud, malice, or was grossly negligent by acting with wanton or reckless disregard for the lives, safety or property of others. *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 51-52 (Ky. 2003). A party is

entitled to have the jury instructed on the issue of punitive damages "if there was any evidence to support an award of punitive damages[.]" *Shortridge v. Rice*, 929 S.W.2d 194, 197 (Ky. App. 1996) (emphasis omitted). The threshold for the award of punitive damages is whether the misconduct was "outrageous" in character, not whether the injury was intentionally or negligently inflicted. *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 389 (Ky. 1985).

In a case where gross negligence is used as the basis for punitive damages, gross negligence has the same character of outrage justifying punitive damages as willful and malicious misconduct in torts where the injury is intentionally inflicted. Just as malice need not be expressed and may be implied from outrageous conduct, so too may wanton or reckless disregard for the rights of others be implied from the nature of the misconduct. *Id.* at 389-90. However, a finding of gross negligence clearly requires more than a failure to exercise ordinary care. It requires a finding of a failure to exercise even slight care such as to demonstrate a wanton or reckless disregard for the rights of others. *Id. See also Phelps*, 103 S.W.3d at 51-52. In other words, gross negligence requires "a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by wanton or reckless disregard for the lives, safety or property of others." *Gibson v. Fuel Transp., Inc.*, 410 S.W.3d 56, 59 (Ky. 2013)

(citing *Horton*, 690 S.W.2d at 389-90). *See also Nissan Motor Co., Ltd. v. Maddox*, 486 S.W.3d 838, 840 (Ky. 2015).

In this case, the Estate has not alleged any conduct by Co-part rising to the level of fraud, oppression, or malice. The Estate merely alleged that Co-part's actions violated its common law and statutory duties of care, which would amount to negligence. Further, the Estate does not allege that Co-part failed to exercise even slight care such as to demonstrate a wanton or reckless disregard for the rights of others. Therefore, the trial court did not clearly err in granting a directed verdict on this claim or by excluding evidence of Co-part's prior practices.

## XIII. AMENDMENT OF FINAL JUDGMENT

Lastly, the Estate argues that the judgment should be amended to contain language to facilitate enforcement against Chapa in Texas. In particular, the Estate contends that Texas law requires the judgment to recite, "This is a final and appealable judgment for which execution may be had, and there is no just cause for delay." This language is essentially the same as is required under CR 54.02 to grant a final judgment on less than all of the claims in an action.

In this case, however, the judgment conclusively disposed of all the pending claims. Consequently, the judgment was final as a matter of law and the finality language was not required. CR 54.01. In its pleadings to the trial court, the Estate did not argue that the language was necessary to facilitate enforcement

of the judgment in Texas. Therefore, we conclude that this error is not preserved. However, the Estate may be entitled to ask the trial court to modify the judgment pursuant to CR 60.02.

The Estate also argues that the judgment incorrectly states that AUF was not before the court. For purposes of this action, Barraza and AUF were before the trial court for purposes of Co-part's third-party complaint. But as discussed above, the Estate never asserted a claim against AUF directly. Consequently, AUF's liability could only be derivative of any liability by Co-part. Since the jury did not return a judgment against Co-part, the judgment did not apply to AUF. Nevertheless, since we are remanding for a new trial on the claims against Co-part, any question concerning the language of the judgment with respect to AUF or Barraza is moot.

## XIV. CONCLUSION

In conclusion, the trial court correctly found that the Estate was required to comply with the requirements of the Hague Convention to obtain service of the complaint on Ramos. Since the Estate failed to comply with those requirements, the trial court properly quashed the service of the complaint on him. We also hold that Allstate and Hartford were not obligated to maintain insurance coverage on the Toyota or the Jeep after the titles were delivered to AUF's agent. In addition, the Estate has failed to show that Allstate and Hartford remained liable

for any negligence or statutory violations by Co-part. Therefore, the trial court properly granted summary judgment for Allstate and Hartford on these claims.

For similar reasons, we also conclude that Co-part was not obligated to maintain insurance coverage on the vehicles following delivery of the titles to AUF's agent. Consequently, the trial court properly granted summary judgment on these claims. We also hold that the trial court properly granted summary judgment on the claims against the Co-part executives and the statutory claims against Co-part under KRS 186A.065 and 189.100. We further conclude that the trial court did not abuse its discretion by denying the Estate's motions to file the amended complaints.

However, we disagree with the trial court that AUF was not a purchaser "for use" within the meaning of KRS 186A.100. Similarly, we also disagree with the trial court that Ramos was not operating the Jeep within the meaning of KRS 189.224. Therefore, the trial court erred by granting summary judgment on these claims. We also conclude that the trial court abused its discretion by allowing Co-part to withdraw an admission after the discovery period had ended.

Since the Estate was prejudiced by the failure to instruct on the statutory claims, withdrawal of the admission and several evidentiary rulings flowing therefrom, we must reverse the jury verdict and judgment on the claims

against Co-part and remand this matter for a new trial on the negligence, negligent entrustment, and remaining statutory claims.  However, the Estate has failed to show gross negligence by Co-part.  Therefore, the trial court properly granted a directed verdict for Co-part on the claim for punitive damages.  Finally, we note that Chapa has not appealed the adverse jury verdict in this case.  Therefore, the judgment against Chapa shall remain undisturbed.

Accordingly, the judgment of the Jefferson Circuit Court is affirmed in part, reversed in part, and remanded for a new trial as set forth in this opinion.

ALL CONCUR.


BRIEFS FOR APPELLANT:

G. Adam Redden
Richard Breen
Louisville, Kentucky

ORAL ARGUMENT FOR
APPELLANT:

Richard Breen
Louisville, Kentucky

BRIEF FOR APPELLEE
ALLSTATE INSURANCE
COMPANY:

Robert E. Stopher
Robert D. Bobrow
Louisville, Kentucky

ORAL ARGUMENT FOR
ALLSTATE INSURANCE
COMPANY:

Robert E. Stopher
Louisville, Kentucky

BRIEF FOR APPELLEE
PROPERTY & CASUALTY
INSURANCE COMPANY OF
HARTFORD:

R. Craig Reinhart
Neal J. Manor
Lexington, Kentucky

ORAL ARGUMENT FOR
APPELLEE PROPERTY &
CASUALTY INSURANCE
COMPANY OF HARTFORD:

R. Craig Reinhart
Lexington, Kentucky

BRIEF FOR APPELLEES CO-PART
OF CONNECTICUT D/B/A CO-
PART AUTO AUCTIONS, WILLIS
JOHNSON, PAUL STYER,
WILLIAM FRANKLIN, TOM
TAYLOR, AND DANIEL BOND:

Michael E. Hammond
J. Lacey Fiorella
Lexington, Kentucky

ORAL ARGUMENT FOR
APPELLEES CO-PART OF
CONNECTICUT D/B/A CO-PART
AUTO AUCTIONS, WILLIS
JOHNSON, PAUL STYER,
WILLIAM FRANKLIN, TOM
TAYLOR, AND DANIEL BOND:

Michael E. Hammond
Lexington, Kentucky

BRIEF FOR APPELLEE LIBERTY
MUTUAL FIRE INSURANCE CO.:

Charles H. Cassis
Aaron J. Silletto
Prospect, Kentucky

ORAL ARGUMENT FOR
APPELLEE LIBERTY MUTUAL
FIRE INSURANCE CO.:

Charles H. Cassis
Prospect, Kentucky

BRIEF AND ORAL ARGUMENT
FOR OSCAR RAMOS:

Edward H. Bartenstein
Louisville, Kentucky